**KRAFT FOODS CO.**

v.

**WALTHER DAIRY PRODUCTS** et al.

Civ. A. No. 2195.

United States District Court
W. D. Wisconsin.

Feb. 1, 1954.

As Amended Feb. 12, 1954.

**2**

Stephens, Bieberstein & Cooper, Glenn W. Stephens, Madison, Wis., Soans, Glaister & Anderson, Cyril A. Soans, Edwin M. Luedeka, Chicago, Ill., Snyder, Chadwell & Fagerburg, Erwin P. Snyder, Victor P. Kayser, Chicago, Ill., for plaintiff Kraft Foods Co.

Stroud, Stebbins, Wingert & Stroud, E. L. Wingert, Madison, Wis., Maxwell Barus, W. P. Churchill, Stuart A. White, William K. Kerr, New York City, for defendants Walther Dairy Products and Borden Co.

Thomas, Orr, Isaksen & Werner, San W. Orr, Joseph G. Werner, Madison, Wis., for defendant-intervener Wild Cooperative Cheese Company and defendants Wisconsin Swiss & Limburger Cheese Producers' Ass'n and Cheese Producers' Marketing Ass'n.

Vernon W. Thomson, Atty. Gen., Roy G. Tulane, Asst. Atty. Gen., for defendant-intervener State of Wisconsin.

STONE, District Judge.

This is an action for infringement of U. S. Patent No. 2,494,636, relating to the manufacture of Emmenthaler cheese. The application for the patent was filed June 15, 1946, and on January 17, 1950, the patent issued to plaintiff, as assignee of the inventor, James Bryan Stine.

The parties hereto will be referred to as follows: the plaintiff, as "Kraft"; the defendants, as "Walther", "Wild", "Borden", "Producers' Association", "Marketing Association", and "the State".

Plaintiff Kraft, a Delaware corporation, now is, and has been for many years past, a large manufacturer and distributor of cheese, including Swiss cheese.

Defendant Walther is a partnership, and operates a cheese factory at Platteville, Wisconsin.

Defendant Borden is a New Jersey corporation, and a large distributor of cheese, including Swiss cheese. Its Swiss cheese procurement business is handled through its Lakeshire-Marty Division at Monroe, Wisconsin.

Intervener-defendant Wild is a Wisconsin cooperative association, a manufacturer of Swiss cheese, doing business at Verona, Wisconsin.

Defendants Marketing Association and Producers' Association are charged with infringement by aiding and abetting the alleged infringing operations of Wild and assisting in Wild's defense.

The complaint charges the State with infringement by aiding and abetting Wild.

Emmenthaler cheese is commonly known as "Swiss" cheese.

The complaint alleges that Walther infringed the patent; that Borden aided and abetted Walther in its alleged infringing activities, in that Walther manufactured Swiss cheese under an arrangement whereby Borden furnished Walther with the milk and the materials necessary to produce the cheese, which was produced by Walther for a "service fee". Borden agreed to hold Walther harmless of all liability and expenses resulting from the alleged patent infringement. Pursuant to this arrangement, The Borden Company, at its expense, undertook the defense of Walther in this litigation. Walther discontinued its alleged infringing activities in May of 1952, and resumed the manufacture of wheel Swiss cheese by the conventional method.

The defendant Borden is also charged in the complaint with infringing operations on its own premises at Orangeville, Illinois, and Monroe, Wisconsin.

The complaint charges that the alleged infringing activities of Wild were begun at the instigation of Producers' Association and Marketing Association, and the State; that these defendants not only furnished materials and supplies used by Wild in the manufacture of rindless Swiss cheese, but each sent employees to the Wild factory, who there engaged in alleged infringing acts and instructed the employees of Wild in the methods to be followed. The Associations agreed to hold defendant Wild harmless from all expenses and any liability for infringement that may be determined against it in this action.

Defendant State of Wisconsin intervened as a party defendant on October 22, 1952, and is charged in the complaint not only with infringement but with having conspired with the two Associations and with Wild to infringe the patent, and with having aided and abetted the infringement by defendant Wild.

The defendants asserted the usual defenses of noninfringement. They contend that Stine is not the first inventor but that the invention was made in 1943 by Clemence J. Honer, then an employee of the Department of Agriculture of the State of Wisconsin; that the Stine patent was anticipated by the Honer work, and by various patents and publications relating to processes for making rindless Cheddar or American cheese, and rindless Swiss cheese, by the use of said processes in the United States and foreign countries; that the Stine patent does not fully or accurately teach the Stine method for making rindless block Swiss cheese; that Stine derived his invention from Honer.

In the Advisory Standards of the Food & Drug Administration issued in 1936, page 5, and Section 97.02 of the Wisconsin Statutes, cheese is defined as follows:

"Cheese. The product made from the separated curd obtained by coagulating the casein of milk, skimmed milk, or milk enriched with cream. The coagulation is accomplished by means of rennet or other suitable enzymes, lactic fermentation, or by a combination of the two. The curd may be modified by heat, pressure, ripening ferments, special molds or suitable seasoning. Certain varieties of cheese are made from the milk of animals other than the cow. * * *"

There are over 500 kinds and varieties of cheese. Each is different from the other. Such differences primarily result from varying the method of production, e. g. differences in the type of milk used, differences in cultures, differences in heating or cooking, differences in methods of curing or ripening, and the like. In each case different methods and

**4**

materials are used for the reason that a different end product or "cheese" is desired. Materials and methods which will produce one kind of cheese may not be adaptable to the production of another kind of cheese.

The cheese involved in this action is Emmenthaler, and is known in the United States as "Swiss" cheese. Swiss cheese is defined in the 1936 Federal Advisory Standards, page 6, as follows:

"Swiss Cheese. The cheese made by the Emmenthaler process from heated and pressed curd obtained by the action of rennet on whole milk or on partly skimmed milk. It is ripened by special gas-producing bacteria, causing characteristic 'eyes' or holes. The finished cheese contains, in the water-free substance, not less than 45 per cent of milk fat."

Another similar definition which begins "Emmenthaler cheese, commonly known as domestic Swiss cheese * *" appears in the Wisconsin Statutes (1951), Section 97.02.

The "eyes" or holes in the Swiss cheese are associated with the quality and flavor of the cheese, and Swiss cheese not having well-spaced and well-formed eyes is not considered as commercially desirable.

The Stine patent is solely concerned with the production of Emmenthaler or Swiss cheese. It discloses and claims improvements in the conventional method of making Emmenthaler cheese. It makes no claims and is in no way concerned with the production of any other kind of cheese.

Emmenthaler cheese originated in Switzerland centuries ago, and the process of manufacture was introduced into this country over one hundred years ago.

Under the conventional method the cheese has traditionally been made in circular disks or "wheels" of from 160 to 230 pounds, having a diameter of about 3 feet and of about 5 to 12 inches in height. This cheese has a hard, inedible rind of ½ inch or so in thickness which is unfit for human consumption.

The steps in the conventional process for the manufacture of Emmenthaler or Swiss cheese are as follows:

(a) *Preparation of Milk.*

The fat content in the milk is usually standardized in order that the finished cheese will have a certain butterfat content, which under present standards must not be less than 43% fat on a dry basis (known as F. D. B.) The milk also may have been pasteurized and usually is clarified, that is, put through a clarifier to eliminate foreign matter.

(b) *Additions of Cultures or Starters.*

After the milk is placed in the kettle, i. e., from 2,000 to 2,500 pounds of milk, the cultures or starters are added. In the event that the milk has been pasteurized or heated to near pasteurization, *Streptococcus lactis,* a milk souring organism, may be added. In addition there is added *Streptococcus thermophillus,* also a milk souring organism, which can grow at a higher temperature than *Streptococcus lactis* and *Lactobacillus bulgaricus* which has the ability to develop acid in the making operation and in the early stages of curing. There is usually added *Propionibacteria shermanii* to insure that an adequate number of propionic acid producing organisms will be present to form propionates which impart a substantial portion of the characteristic flavor to the cheese.

(c) *Coagulation of Milk.*

The milk is coagulated to form a gel-like mass by the addition of rennet after adjusting the milk temperature to somewhere between 85 and 95 degrees.

(d) *Cutting of Curd.*

Thereafter the gel-like curd is cut through the use of a "harp", in a cutting or stirring operation taking approximately thirty minutes to an hour, the final size of the curd particle being about that of a grain of wheat. This operation aids in the separation of the curd from the whey.

(e) *Cooking Operation.*

Next, the temperature is raised gradually over a period of about thirty minutes to somewhere around 125 to 130 degrees Fahrenheit, and the curd is further cooked for about thirty minutes to an hour, during which time the curd is further stirred. During this period there is a further separation of the curd from the whey and the curd is firmed to the necessary degree.

(f) *Separation of Curd from Whey.*

Thereupon the curd is separated from the whey by dipping it out in a dip net or cloth which is drawn under the body of the curd by the use of a flexible metal band, after which the net is formed into a sack containing the curd.

(g) *Pressing.*

The sack of curd is then placed in a press form, i. e., a circular hoop of about 30 inches in diameter and about 5 inches in height, and a circular disk placed upon it and weight is applied for the purpose of pressing the curd. The pressing operation promotes the knitting of the curd and the expelling of some whey. The net or cloth is removed and from time to time, the curd is turned, fresh cloths are put around it and the press weight is reapplied. The cloth changing and turning is called "dressing" and is repeated several times. The pressing operation usually continues overnight or a total of approximately eighteen hours.

(h) *Salting or Brining.*

The next step is to salt the curd, which in the conventional Swiss procedure is done by floating the curd in a brine tank. The brining can immediately follow the pressing or, in some instances, the cheesemaker may delay a day or two for example, leaving the cheese bare in the hoop at a temperature of from 50 to 55 degrees Fahrenheit, during which time the curd cools off and firms up.

The brine tank contains a substantially saturated solution of ordinary salt. The curd is left in the brine tank for from about one to four days, depending upon the size of the body of curd.

The brining not only salts the curd, but causes it to firm up additionally and develop a hard, dehydrated shell. During the brining stage the salt penetrates only a small distance into the curd and forms in effect a shell or layer of high salt concentration which is hard and which has a moisture content lower than the remainder of the body of curd.

(i) *Curing.*

Upon removal from the brine tank, the disk or wheel of curd is usually placed on a board and stored on a shelf in a room at a temperature of 50 to 55 degrees Fahrenheit for varying periods of time, even up to fifteen or more days, depending upon how fast the cheesemaker thinks the curd is being conditioned, and then put into the curing room, or in isolated cases the cheesemaker may eliminate the 50 to 55 degree Fahrenheit treatment and put the curd into the curing room immediately from the brine tank if he believes no further conditioning is needed. The curing room which is usually known as the "warm room" or "hot room" is maintained at a temperature of from 70 to 76 degrees Fahrenheit. It is chiefly during this curing period that the characteristic sweet, nut-like flavor appears, through the action of the various organisms, and at the same time the holes or "eyes" in the cheese are formed, being desirably of a large size, e. g., from the size of a nickel to that of a quarter.

The period of time in the warm room is in the neighborhood of from two to six weeks. During this curing operation these large heavy wheels of cheese develop a coating of mold. To remove the mold the wheels are turned over and scrubbed with a salt solution from two to three times a week by the cheesemaker or his helper. The washing and salting has the effect of further building-up the hard surface or rind on the cheese, and serves to remove the visible mold. The body of cheese expands in volume from about 15 to about 20% during the hot room period, the average expansion being about 17 to 18%.

(j) *Aging.*

The cheeses are "plugged", that is the trier is inserted to withdraw a cylindrical plug by means of which it is determined whether the eyes have properly formed. When the eyes are of proper size, the cheese is removed to the so-called cold room which is at a temperature of usually from 40 to 45 degrees Fahrenheit, which tends to arrest further eye formation, the cheese being held in this cold room until ready for sale.

Emmenthaler cheese is produced in wheel and in so-called block form. In block Swiss the curd is pressed in a rectangular hoop rather than the circular one. These blocks have been usually about 25 inches in length, 6 by 6 inches in height and width. This cheese has been cured in the conventional manner, with the traditionally hard rind, and has been rererred to herein as "wheel cured block Swiss". However, this cheese is not cured in any kind of a form or mold, and in the process of the expansion which goes on during curing, all six sides of the cheese swell out so that the rectangular shape substantially disappears.

The cheese most widely produced and consumed in the United States is "American cheese", known as "Cheddar cheese". This cheese has been traditionally made in various shapes called Cheddars, cylindrical cheeses weighing 60 or more pounds; Daisies, cylindrical cheeses weighing approximately 22 pounds; Longhorns, elongated cylindrical cheeses weighing 12 to 13 pounds. The method of production of Cheddar cheese is markedly different from that of Emmenthaler cheese.

Defendants cited prior patents and publications relating to the production of natural rindless cheese of types other than Swiss, most of which said patents related to rindless Cheddar cheese and were issued prior to the date of Stine's application. They include:

U. S. Patent No. 1,925,443 issued to Gere on September 5, 1933. U. S. Patent No. 2,077,300 issued to Abrams, Wagner & Davis on April 13, 1937. U. S. Patent No. 2,226,700 issued to Abrams & Wagner on December 16, 1941. U. S. Patent No. 2,424,693 issued to Jones on July 29, 1947. U. S. Patent No. 2,361,-749 issued to B. F. Davis on October 31, 1944. British Patent No. 556,653 issued to Wingfoot on October 14, 1943. French Patent No. 858,415 issued to Auzols on November 25, 1940.

The publications described the use of the procedures set forth in the foregoing patents, or other procedures similar thereto.

Some of these procedures had been extensively employed commercially in the United States prior to the date of the Stine application in the production of rindless Cheddar cheese, but none were used commercially for the production of rindless Swiss cheese.

In the curing process for Cheddar, described in the foregoing patents and publications, the curd was wrapped while in a soft, moist and pliable condition, without loss of moisture and before rind had formed, in a wrapper either permeable to gas or with a vent or an opening to permit the gas to escape from the curd. While still moist and pliable it was subjected to external pressure to cause the wrapper to adhere to the cheese and to expel the air. It was either not cured in a container or was cured in a form in which it was pressed and without provision for expansion.

In the procedure described in the Stine patent, the block of unsalted curd is surfaced brined to form a rind-like surface as in the conventional Swiss wheel process and then dried. The surface of the curd is then sealed for the purpose of retarding the escape of gases formed during the curing process and to prevent moisture leaving the surface of the cheese. The sealed curd is not subjected to any external pressure, but it is placed in a confining mold or form of such size that at the end of the curing period, the cheese snugly fits the mold. Under this process, unlike the Cheddar

process, a hard rind-like surface is formed in the process of brining and drying and thereafter during the curing process this hard surface is converted or transmuted into a soft edible cheese.

On September 5, 1933, Clair M. Gere obtained Patent No. 1,925,443. It related to making and curing Cheddar cheese in rectangular form, in a sealed moisture-proof wrapper that provided an escape for the carbon dioxide gas generated during the curing process. This process was not used commercially.

About 1935, Allen Abrams, Charley L. Wagner and Benjamin F. Davis, of The Marathon Corporation of Rothschild, Wisconsin, devised the first commercially successful method for producing rindless Cheddar cheese, and later Abrams and Wagner developed a second method for producing rindless Cheddar. These two methods were described in Patents No. 2,077,300 issued April 13, 1937, and No. 2,266,700 issued December 16, 1941, and in other publications in evidence in this action.

The first method known as "Parafilm Method" has been widely used in the Cheddar cheese industry since 1936. This patent taught the wrapping of a moist block of Cheddar cheese immediately after it had been taken from the press, in rectangular shape, and while it was still warm, in a layer of parafilm, a gas-permeable, wax-rubber sheet produced by Marathon Corporation.

The second Abrams method described in Patent No. 2,266,700 has been used in the Cheddar cheese manufacture since 1943. It involved the addition of a secondary outer wrapper, after the cheese was enclosed in a primary film or sheet consisting of wax and rubber as disclosed in Abram's Patent No. 2,077,-300. The outer wrapper was a highly gas-impervious sheet. The sealing is carried out so as to leave some opening for gas to escape and to prevent bloating or swelling of the package. It permitted the storing of the cheese for a very long period of time. It permitted curing of cheese without substantial loss of moisture.

Another process for making rindless Cheddar cheese was described in the Lewis H. Jones Patent No. 2,424,693; the application filed June 9, 1943; Patent issued July 29, 1947. It related to curing of Cheddar cheese and more particularly to packaging of Cheddar as a step in the process of curing. This process involved forming a fresh curd into a cylindrical shape block before a rind had been formed and wrapping the block in a thin, limp moisture-proof and oil-resistant wrapper, known as Pliofilm, nesting them in a wooden box and subjecting them to pressure therein and curing them while thus subjected to pressure. This process also met with prompt success.

The British Wingfoot Patent No. 556,-653 issued October 14, 1943, describes a method of processing and packaging Cheddar cheese enclosing a rindless curd in a limp oil-resistant wrapper and pressing the wrapped cheese into the container. The blocks may range from one-half pound to forty pound blocks, or larger.

These processes for making rindless Cheddar cheese were developed and were given wide publicity and put in immediate large scale commercial use.

The Benjamin F. Davis Patent No. 2,-361,749, issued October 31, 1944, described a method of pressure packaging of Cheddar cheese by individually wrapping hexagonal blocks of cheese with a thin, oil-, air-, and moisture-resistant wrapper, and then exerting pressure on the cheese to cause it to fill out the entire volume of the box.

The French Patent to Auzols, No. 858,-415, relates to the enclosing of various types of cheese, including Emmenthaler, in water proof bags for storage after the cheese has been manufactured, for the purpose of lengthening the period of preservation of the cheese or the curing period. In the case of Swiss cheese, the bagging would take place after the cheese had left the hot room. There is no claim or suggestion that the bagging and subsequent storage would cause the rind to disappear, nor any teaching or

suggestion of the use of the confining form. This patent does not teach or disclose the invention claimed in the patent in suit, nor would it be within the capacity of one skilled in the art to change or adopt the disclosure in the Auzols Patent to the production of rindless block Swiss cheese.

The Swedish article, "The Testing of Cheese Wax" published in 1939, shows an experimental use of a cheese wax more flexible than paraffin on Herrgards cheese, Gouda cheese, and Hushalls cheese, the cheese being dipped in wax from one to three times during the curing period. The article indicates a reduction in shrinkage and mold but makes no claim that the procedure resulted in rindless Swiss cheese, or in the reduction of existing rind, or the prevention of further rind. The use of the confining form is not taught. The Swedish book "Mejerilara" published in Stockholm in 1940 offered to show what Herrgards cheese is, shows that it is similar to Edam and Gouda, the Dutch cheeses, rather than like Swiss cheese. Neither of these Swedish references disclose or suggest the invention disclosed in the patent in suit.

As a defense the defendants rely principally on the work done by Clemence J. Honer as anticipating Stine.

In June 1943, Honer, a young man who had just graduated from the University of Wisconsin with a B. S. degree in Dairy Industries, was employed by the Department of Agriculture of the State of Wisconsin for research work to develop a process for making rindless Swiss cheese. He had no practical experience with the cheese industry other than what he acquired while employed by the Madison Milk Producers Association during the summer vacation of 1942. He was assigned to work with Merrill Richardson, who had been employed by the Wisconsin Department of Agriculture since June 1936, and was then a Marketing Specialist for the State engaged mostly in promoting the marketing of dairy products. Richardson had been familiar with the marketing difficulties and losses connected with wheel Swiss since 1927. He was also familiar with the work that Abrams, Davis, Jones and several others were doing in connection with rindless Cheddar cheese prior to 1943. His concern with the program for the development of rindless Swiss cheese started with a conference between Lewis Jones and Gordon Crump of the Department's Dairy Promotion Division.

Lewis H. Jones, a salesman for The Goodyear Tire and Rubber Company of Akron, Ohio, came to Wisconsin in 1940 to promote sales of Pliofilm for use in packaging cheese. That summer he learned of the work done on curing rindless Cheddar cheese by Benjamin Davis. Later he obtained Patent No. 2,424,693, relating to the curing of rindless Cheddar cheese. In 1943 he conferred with Crump and it was then agreed that he and Richardson would be responsible for the carrying out of the program to experiment on a process to make rindless Swiss cheese. The experimental work began with Honer in charge on July 1, 1943.

Before any experimental work was started, Honer, Richardson and Jones discussed the problem with scientific experts at the University of Wisconsin and Iowa State College, and also consulted practical Swiss cheese making experts. They studied scientific literature relating to Swiss and other types of cheese, patents relating to cheese packaging, and when they started the experimental work they were familiar with the methods that had been developed for the manufacture of rindless Cheddar cheese.

Supplies were obtained and the experimental work was commenced on July 16, 1943, at the factory of Escher Brothers, skilled Swiss cheesemakers, at the plant of the Northside Cheese Company at Monticello, Wisconsin, where blocks of curd were made by using the conventional Emmenthaler process and later cured at the Department's laboratory at Madison. In all 22 kettle batches of curd were made at Monticello between July 16, 1943 and December 19, 1943.

Commencing in January 1944 about 23 batches of curd were made at the factory at the Madison Milk Producers in Madison, Wisconsin. This curd was also cured at the Department's laboratory. Honer left the employ of the State early in 1946, and was employed by The Dairyland Cooperative Association in Waterloo, Wisconsin. There he made 7 batches of curd between March 1946 and July 1946, which was cured at Waterloo by a process the purpose of which was to produce rindless block Swiss cheese. At that time Kraft was making rindless Swiss cheese at Milledgeville, Illinois, following the procedure outlined in the Stine patent.

Honer testified that Batches 001–002 were dried before wrapping, although in the written notes made by him at the time he made these batches there is nothing that shows any drying period.

Richardson testified that the blocks were taken out of the brine and the free moisture wiped off with a cloth and that they were wrapped within a few hours. His notes as to Batches 001–002 disclose "that after 54 hours the curd was taken from the brine, wiped and wrapped in Pliofilm." *No drying period is mentioned.* In a report to the Directors of Marketing Association upon the experiments to produce rindless Swiss, Richardson said the cheese is also wrapped in Pliofilm *as soon as it is taken from the salt bath* in order to eliminate the thick rind which ordinarily develops on wheel Swiss.

Jones testified that the blocks were dried by tapping a cloth against them and that the first batch was wrapped rather quickly after it was removed from the brine; that they were removed from the brine and dried off in some manner or other to free them from free moisture and then wrapped.

Fred Escher, the cheesemaker who assisted Honer in his experiments, testified, "After they were taken out and dried, the free water was dried off of them and they were wrapped." In the Interference proceedings he testified, "that the blocks were wiped off with a cloth and were immediately wrapped".

Honer's notes disclose that the blocks were "pressure packed", which is a part of the process used in making rindless Cheddar.

Richardson also testified that "Honer dipped the whole kettle of curd, and wrapped it in Pliofilm and put it in a tight box similar to the way we were packaging American cheese at the time that had been developed."

The first curd made at Monticello was cut into six blocks, 11″ x 14″ x 6″ in size, and brined in the conventional manner. Five of these blocks were wrapped in Pliofilm, held in place with scotch tape. Each block was overwrapped in glassine and placed in a wooden box. A floating wooden lid was inserted in the box to rest on top of the cheese. The cheese was then transferred to Madison for curing.

Batch 002 was made July 19, 1943, by Escher Brothers using the conventional Emmenthaler process. A part of the original block of curd was brined for thirty hours. One block, No. 6, was not brined but was split open and 0.3 pounds of salt was spread over the interior faces of the block after which the two halves were pressed together. The other five blocks were wrapped in Pliofilm, overwrapped in glassine and placed in curing boxes with floating lids and weights and transported to Madison for curing.

The procedure followed in Batches 001–002 was never again used by Honer, or his associates. In the next twenty batches he attempted various changes in the conventional Emmenthaler process for making and brining the curd prior to the curing stage, such as salting the milk, salting the curd, dipping rather than netting the curd. He tried to adopt the procedure used in rindless Cheddar cheese, using the same wrapping and pressure packing.

On direct examination Honer testified:

"After the 001 and 002 lots, when we saw the slight crust formed over

the blocks, as we removed them from the brine, and of course this unappetizing appearance, and condition of the brine, I wondered if we could get away from this brine salting; so on that assumption or basis, some of the subsequent batches were varied to the extent that salt was added to the milk, as one possibility, and to the curd as another possibility. * * * There were also other variations."

Honer next went to the plant of Madison Milk Producers in Madison, where he carried on his experiments, still as a State employee, until November 30, 1944. With reference to this work on rindless Swiss cheese at this plant, he testified:

"I was disappointed. The results were far from what I expected. A good share of it was thrown away, discarded. Some of it was used in grind, what we call grinding cheese experiments, where we take cheese, grind it up, and add a little salt to it, and probably some sodium citrate, and a few other things, to improve the consistency of it, and try to make what you call a spread cheese."

He did not devote all of his time as a State employee to experiments on rindless Swiss cheese, as is shown by the following testimony:

"Then I can think of another activity that we became involved in, of packaging butter in aluminum foil, as compared to packaging in parchment, especially to see if we could protect the butter from foreign flavors from surrounding conditions in the refrigerator, or wherever the butter happened to be stored. * * *

"I left the employment of the State of Wisconsin the last day in January, 1946."

During his experiments he did not know that to make rindless Swiss cheese it was necessary to make the cheese in the conventional Emmenthaler method, and that it was necessary to dry the curd and to securely wrap and seal the surface to retard the escape of the gas, and to place the curd in a mold with room for it to expand during the curing period and while the eye formation progressed.

The evidence discloses that the cheese produced by the Honer experiments had "poor eye formation", "distinct tallow odor on surface", "rind rot", "smell of gas", "bad flavor", and had a "briny flavor". It was obviously not a marketable product. Of the 3,000 pounds of their experimental cheese about 125 pounds was sold as salvage. It had no marketable value except for salvage. While some of the alleged Honer product was displayed at a Kiwanis meeting in 1943 as rindless Swiss cheese, it was never seriously claimed that it was marketable.

Of the twenty-two batches made by Honer at Monticello, no two were alike or made by the same process. All batches after 001–002 were admitted failures. He abandoned his experiments when it was apparent to him that he had not found the process to make rindless Swiss cheese. Nothing more was heard of Honer until after the Stine patent issued and he was recalled by the defendants to make the application for the patent that initiated the Interference proceeding.

The comments of Honer on his "make records" as to Batches 001–002, claimed to be his best product from the experiments, shown on Exhibit 224, are as follows:

Batch 001

Block No. 1:    (Cured at Monticello as "control block")
Fair eye formation, not uniform, varied size
No mold growth
Body: Fair–dry.  Texture: Fair
Flavor: Lacking
Surface condition: ½ inch rind
Criticism: Poor flavor–rind
Disposal: Sold

Block No. 2:    Few eyes, not uniform—mechanical openings
Some mold growth on end
Body: Good.  Texture: Fair
Flavor: "Approaches Swiss-like"
Surface condition: Bad flavor
Finish: Semi-soft rind
Criticism: Surface flavor
Disposal: Sold

Block No. 3:    Two fair eyes, not uniform, varied size
Mold growth on wrapped edge
Body: Fair–mechanical openings
Texture: Mechanical openings
Flavor: Cheddar-like
Surface condition: Bad flavor.
Finish: Semi-soft rind
Criticism: Flat flavor
Disposal: Sold

Block No. 4:    No good eye formation, but mechanical openings, varied size
Mold growth over top surface
Body: Good.  Texture: Smooth and creamy
Flavor: Fairly good Swiss
Surface condition: Very bad flavor
Finish: Very little rind
Criticism: Surface condition
Disposal: Sold

Block No. 5:    Few eyes, size of marble.
Mold growth–two areas
Body: Fair.  Texture: Smooth and creamy
Flavor: "Approaches Swiss-like"
Surface condition: Bad flavor
Finish: Semi-soft rind
Criticism: Lacks flavor
Remarks: Better than #3
Disposal: Sold

Remarks on 8–17–43:    Seemed to be more mold on the cheese that was kept in mid-cooler for two weeks.  Heavy rind on all blocks.  (Blocks 2 and 3 were kept in mid-cooler two weeks, and 4 and 5 only eight days.)

Batch 002

Block No. 1:  (Also cured as "control block")
Poor eye formation, blind on top; ¼ inch eyes, not uniform
No mold growth
Body: Fair.  Texture: Hard
Flavor: Fair
Surface condition: ½ inch rind
Criticism: Eyes and flavor
Disposal: Sold

Block No. 2:  Twelve good eyes, not uniform, nest on top, eyes normal size
Mold growth: Very slight
Body: Fair plus..  Texture: Good
Flavor: Fair plus
Surface condition: Flavor bad
Finish: No rind
Criticism: Surface flavor
Remarks: Better Lot 001
Disposal: Sold

Block No. 3:  Fourteen good eyes, not uniform; nest on top a few large eyes "normal"
Mold growth: White spots.  Mold
Body: Rubbery.  Texture: Fair
Flavor: Bitter Swiss-like
Surface condition: Tallowy.  Bad flavor
Finish: Slight rind
Criticism: Surface flavor
Disposal: Discard

Block No. 4:  Eight good eyes, not uniform, normal size, nest on top
Mold growth: Very slight
Body: Fair plus.  Texture: Good
Flavor: Fair plus plus
Surface condition: Flavor very bad
Finish: No rind
Criticism: Surface flavor
Remarks: Better Lot 001
Disposal: Sold

Block No. 5:  A few fair eyes, not uniform, of poor size, nest on bottom
Mold growth: White mold on top
Body: Good.  Texture: Good
Flavor: Fairly good Swiss
Surface condition: Bad odor.  Drainage
Finish: No rind
Criticism: Surface condition
Disposal: Sold

Block No. 6:    Block No. 6 was given entirely different treatment from the other blocks in Lots 001 and 002, in that the block was split, 0.3 pounds of salt added in cut, the two halves realigned and repressed prior to wrapping. It is not. contended this block could be considered to be the same as the other blocks of these lots. However, the examination on August 30th showed as to this block:

One large eye, almost blind, but mechanical openings.
No mold
Body: Poor. Fair texture and flavor
Surface condition: Terrible–Rot
Finish: Rind in cut surface
Disposal: Discarded

Honer's notes entered in his diary on August 30, 1943, throw some light on whether he had produced a successful process for making rindless Swiss cheese. The complete entry is as follows:

"*Our Big Day.* Opened Lots 001–002–003 & 004 and Lots 101–102–103–104–105–106–107–108 & 109, and one Block of Swiss 007. We went over all our lots ourselves first then at 4 PM Eschers, Stauffacher, Bruhn, Button, Crump and Frost came down. Later Jones took Eschers and Stauffacher, Richardson and I to dinner."

Qualified State Cheese Graders were among those present at the unveiling of the Honer cheese. They made no record of their inspection. It is safe to assume if the inspection disclosed that the experiments were successful in any degree, or indicated even a possibility of ultimate success, it would have been so recorded in the Honer diary. Obviously nothing was found in that inspection that gave those present the slightest hope of making rindless Swiss cheese if they repeated the procedure adopted by Honer up to that date. Honer undoubtedly was of this belief because he never repeated the procedure he used in making Batches 001–002 from which the cheese exhibited at the Kiwanis meeting on October 25, 1943, is alleged to have been taken. Inasmuch as it appears from Exhibit 224 that all of the cheese in Batch 001 was sold and that all of the cheese in Batch 002 was sold, except Blocks 3 and 6 which were discarded, one is led to inquire if the defense may not be mistaken as to their claimed source of the cheese so exhibited at this meeting and later publicized in the Madison newspapers and in the Cheese Journals.

Jones testified that Exhibit 267 is a Daily Call Report dated August 30, 1943, which he sent in as his official report to The Goodyear Tire and Rubber Company of what he saw at the unveiling ceremony at Madison on that date, and that:

"At the foot of the first page of that exhibit I made the notation:

" 'Observations were recorded as we opened all packages. Too numerous for entry herein, but in the main were as below:

" '1. Cheese not far enough along for full development.

" '2. All packages show whey drainage inside of package—an undesirable result as it will make off flavor and no doubt rind rot in all instances.' "

On December 15, 1943, Jones reported to Goodyear in part:

"I am very happy because if the State never gets the Swiss answer, it has accomplished a revolution of the Brick cheese making."

Jones further testified:

"Daily Call Report dated April 3, 1945 (Ex. 273) reports my next contact with Fred, Art and Emil Escher at Monticello North Side Factory:

" 'The boys said the State came and removed all equipment right after our last trip there together and had never returned to do any more work there.'

"That referred to the equipment used in Honer's work there on rindless Swiss cheese."

The court is inclined to believe the disclosure on August 30th was a bitter disappointment to Honer and his associates, and it is only fair to infer that had the experiments proved successful the Department of Agriculture which had expended thousands of dollars in experimental work on rindless Swiss would have immediately tendered the process to the Swiss cheese industry which had been waiting for years for an answer to their problem that rindless Swiss cheese would have solved.

It is also a reasonable inference that if Honer had discovered a successful process the State or Honer would have immediately filed an application for a patent on his alleged invention and would not have waited eight years and until after the Stine patent issued to do so. The Honer application filed in 1951 was practically an exact copy—word for word —of the disclosures in the Stine application and patent.

Honer had failed to discover a process or procedure to make rindless Swiss cheese and abandoned his experimental work for the State in 1946. The Department of Agriculture carried on its experiments from 1943 to 1948 through Honer, Richardson, Jones, and its other employees, Legrid, Piper, Ames and Thomas, and failed to develop a successful process for making rindless Swiss.

Richardson testified:

"That during the intervening seven years (1943 to 1950) the problem of marketing Swiss cheese still continued so far as rind and waste was concerned. That as far as I know the 'Wild factory' was the first one in Wisconsin that made any sizeable quantity of rindless Swiss cheese on a commercial basis. Our first work there was in 1950."

It is the law that crude and imperfect experiments do not confer a right to a patent. He is the first inventor who perfects and adapts an invention to use.

In Seymour v. Osborne, 11 Wall. 516, 78 U.S. 516, 552, 20 L.Ed. 33, the court said:

"Original and first inventors are entitled to the benefit of their inventions if they reduce the same to practice, and seasonably comply with the requirements of the patent law in procuring letters patent for the protection of their exclusive rights. Crude and imperfect experiments are not sufficient to confer a right to a patent; but in order to constitute an invention, the party must have proceeded so far as to have reduced his idea to practice, and embodied it in some distinct form. * * *

"He is the first inventor in the sense of the patent law, and entitled to a patent for his invention, who first perfected and adapted the same to use, and it is well settled that until the invention is so perfected and adapted to use it is not patentable under the patent laws."

In The Corn Planter Patent, 23 Wall. 181, 90 U.S. 181, 210, 211, 23 L.Ed. 161, the court with reference to abandoned experiments used this language:

"The experiment made in 1849, when Remy worked it by hand, was a mere experiment, which was never repeated. * * * Were it not for the application for a patent it would justly be regarded as an abandoned experiment. * * *

"If upon the whole of the evidence it appears that the alleged prior invention or discovery was only an experiment and was never perfected or brought into actual use, but was

abandoned and never revived by the alleged inventor, the mere fact of having unsuccessfully applied for a patent therefor, cannot take the case out of the category of unsuccessful experiments."

The last word of our Courts supporting this rule of law is found in Pacific Contact Laboratories, Inc., v. Solex Laboratories, Inc., 9 Cir., 209 F.2d 529. There the court said:

"Prior unsuccessful experiment does not constitute invention and cannot therefore be an anticipation."

Much of the evidence of the defense as to the Honer experimental work was oral, and dependent upon memories and recollections of the defense witnesses, who testified ten years after the experiments were made, and abandoned.

■ The courts have held that the proof of prior invention or prior use by oral testimony should be scrutinized very carefully; that at best such method of proof is unsatisfactory.

In Searchlight Horn Co. v. Victor Talking Machine Co., D.C., 261 F. 395, 401, the court in considering the oral testimony offered by the defense in its attack on the validity of the patent, said:

"The defendant denies liability because of prior use and anticipating patents. It relies upon oral testimony largely to establish prior use. The proof of prior use by oral testimony should be scrutinized very carefully. At best such method of proof is unsatisfactory. Forgetfulness, liability to mistakes, the power of psychological suggestion, innate tendency to remember what those calling witness desire, possible bias, prejudice, interest, or perjury, all suggest the wisdom of the rule requiring the defendants to prove prior use beyond a reasonable doubt by clear and convincing testimony. Every reasonable doubt should be resolved against one attacking the validity of a patent. The necessity of this rule is emphasized when the

attack is based upon oral testimony alone of facts long past. The law requires not conjecture, but certainty. Anticipation should be established, not merely by testimony of witnesses relating to facts many years previous, but by concrete, visible, contemporaneous proofs, which speak for themselves. The proof must establish a clear conviction, and something more than oral testimony, even of the highest character, is required, where there has been considerable lapse of time." (30 cases cited.)

■ The burden rests on the defendants in this action to prove beyond a reasonable doubt that the patent in suit has been anticipated by prior art or prior invention, and that the prior art use, claimed as a defense herein, was at the time adopted or followed, to an extent sufficient to create a well understood, if not an established practice, capable at any time of being resorted to, and not something incidental, indefinite and fugitive, which is hunted up and brought forward simply for the purpose of defeating the patent. The defense has wholly failed to meet this burden of proof. Cantrell v. Wallick, 117 U.S. 689, 695, 6 S.Ct. 970, 29 L.Ed. 1017.

On January 2, 1951, after the issuance of the Stine Patent, the State of Wisconsin, as assignee of Honer, filed a patent application of Honer in the U. S. Patent office, asserting that Honer invented the Stine process in 1943, the application containing four claims identical to those of the Stine patent.

An Interference was declared between the Honer Application and the Stine Patent, to determine whether Honer had the invention prior to Stine. The State claimed Stine was not the first inventor because Honer allegedly conceived the invention and reduced it to practice at Monticello, Wisconsin, in 1943, when he was a State employee.

Both parties submitted their proof, and, on December 8, 1952, the Patent Of-

fice Board of Interference rendered its decision, Honer v. Stine, 95 U.S.P.Q. 373, in which it rejected the State's contentions and awarded priority of invention to Stine. In its opinion the Board found that Honer did not have a complete conception of the invention and had not reduced it to practice, and that Stine had not derived the invention from Honer. Honer v. Stine, Interference No. 85,178–95 U.S.P.Q. 373 (1952).

The procedure relating to the manufacture of rindless Cheddar cheese as disclosed in the prior art patents and publications in evidence could not be successfully used for the production of rindless Swiss cheese as defined in the Stine patent. If one skilled in the manufacture of cheese were to use the prior art patents and publications relating to rindless Cheddar cheese in an attempt to make rindless Swiss cheese, he would be moving in the wrong direction and away from the teaching of Stine and his efforts would end in failure.

Professor Sommer's ex parte experiments failed to prove that at the time of Stine's invention the prior art disclosed a method for making rindless Swiss cheese, or that it would have been obvious to a person having ordinary skill in the art to make rindless Swiss cheese by the process described and claimed in the Stine patent.

The ex parte experiments of Borden's employees, Erekson and Feutz, failed to disclose any proof that the claims of the Stine patent are invalid.

■ Honer had never developed a process by which marketable rindless Swiss could be produced commercially. He had no conception of how to produce rindless Swiss, and never reduced his alleged invention to practice. To constitute prior use, the identical idea of means expressed in the invention must have been reduced to practice, and made available for immediate use.

■ There can be no reduction to practice unless the inventor knows what he is doing so that he can duplicate the process and teach the public how to duplicate it. Electro Metallurgical Co. v. Krupp Nirosta Co., D.C., 33 F.Supp. 324, affirmed 3 Cir., 122 F.2d 314.

In Field v. Knowles, 183 F.2d 593, 611, 37 C.C.P.A.,Patents 1211, the court said:

"The conception required as an element of invention is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention as it is to be applied in practice * * * the mental process must have been completed and brought to a point where reduction to practice can begin, where invention stops and construction begins. * * * It is not sufficient that the result to be obtained be conceived, but it is required that there be conceived and disclosed the means provided to accomplish that result, Land v. Dreyer, 155 F.2d 383, 33 C.C.P.A.,Patents, 1108."

The problems encountered by the Swiss cheese industry in the production and marketing of the cumbersome wheel Swiss that weighed from 175 to 225 pounds was much more serious than those involved in the marketing of Cheddar cheese.

In the manufacture of wheel Swiss additional labor was required in that it was necessary during the curing period to remove the large wheels from the curing shelves, wash, scrub and turn them two or three times a week, and that required the services of strong able-bodied men.

The hard inedible rind one-half inch thick was not saleable. The area for about two inches beneath the surface was frequently devoid of eye formation, which lessened the value of that portion of the wheel. It was practically impossible for a small retail store to handle an entire wheel. Less than 10% of the retailers handled it. The retailer bought it in sandwich cuts of rectangular size from 3″ to 5″ in width and height, and from 5″ to 16″ in length. The loss in

cutting wheel Swiss into sandwich blocks ranged from 5¢ to 10¢ per pound.

The term "rindless" Swiss cheese means a cheese made by the basic Emmenthaler procedure, with the desired flavor, texture, and eye formation of Swiss cheese, without the hard inedible rind found in the wheel or block Swiss cheese made by the conventional process. Attempts to make a rindless Swiss cheese started about 1942.

All attempts to apply or adapt the rindless Cheddar process to the production of rindless Swiss had failed.

Prior to the issuance of the Stine patent, none of the defendants had sufficient information relating to the process for making rindless Swiss cheese to enable them to produce it.

Stine, an employee of plaintiff, began work on rindless Swiss cheese in October 1945, at plaintiff's Swiss cheese factory at Milledgeville, Illinois, and produced the first rindless block Swiss cheese which involved the sealing of the curd, made and brined in the conventional manner, and which had been dried, in a flexible, extensible, fluid-proof amorphous wax, and curing it in a confining form consisting of a four-sided sleeve which rested on a curing board. Floating lids and weights were first used in February 1946. In March 1946 Stine used a plastic film (Parakote) experimentally for wrapping cheese, but on the date the patent application was filed wax was still being used in the commercial operation. On March 23, 1946, plaintiff made its first commercial shipment of rindless Swiss cheese made by the method covered by the Stine patent. It consisted of 3,000 pounds of sandwich cuts of the rindless Swiss cheese which had been manufactured at plaintiff's Milledgeville plant between September 1945 and March 1946, and shipped to plaintiff's sales branch at Philadelphia, Pennsylvania. This shipment was readily sold. Because of the enthusiastic acceptance of this type of cheese by the branch salesmen and retailers, plaintiff, in September 1946, converted its Milledgeville plant entirely to the production of the rindless Swiss cheese made by the Stine process.

No one before Stine had completed or reduced to practice the invention set forth in the patent in suit. He did not derive the invention disclosed in this patent from the work of Honer, nor was his discovery perfectly obvious to the ordinary skilled workman in the Swiss cheese industry. He was the original inventor of the subject matter disclosed and claimed in the patent in suit.

The Stine patent in suit, No. 2,494,636, was issued January 17, 1950. It described the process by which the conventional method for producing conventional wheel Swiss cheese was modified so as to produce a natural Swiss cheese, with the typical flavor and eye formation of wheel Swiss cheese, but free of rind, which may be made in a rectangular shape or any shape desired by the consumer.

The patent sets out the sequence of nine (9) steps normally used in producing Swiss cheese by the conventional process as herein set forth. Except for the fact that with the Stine process the milk may contain more fat than is customary in the conventional Emmenthaler process, Stine follows the first five steps of the conventional process, namely: (1) the inoculation of the milk with cultures, (2) setting or coagulating the milk, (3) cutting the curd, (4) stirring the curd in the whey, and (5) separating the curd from the whey.

The patent describes the modifications of the subsequent steps of the conventional process, as follows: The pressing of the curd in a rectangular form instead of a wheel shaped form to eliminate more whey, and to knit or consolidate the curd; the soaking of the body of the curd in brine, if the curd is in a large size such as results from a conventional kettle batch of about 2,000 pounds of milk, it may be divided into rectangular blocks of more convenient size, weighing about 80 pounds each; the brined curd is drained and stored in a cold or holding

room, held at a temperature of 50 to 60 degrees for a period of from 4 to 15 days until dry. After the blocks of curd have been dried, the surfaces of the block are sealed by applying to the outside of the block a material which is elastic and flexible, such as wax, or a wrapper coated with wax, sufficiently flexible or elastic to permit expansion of the block during the curing period without fracturing the seal, and it should also be fluid-proof and prevent the escape of gases. No such sealing procedure is used in the conventional Emmenthaler process. The sealed blocks are then placed in confining forms of a size to receive the blocks comfortably, and then as the block expands during the eye-opening period in the warm room, it swells up to snugly fill the box or mold. The patent provides for the use of a floating lid with weights thereon so as to permit the capacity of the mold to increase or expand as the eyes develop in the curing room. It provides that the boxes may be lined with waxed chipboard. In the conventional wheel Swiss process not only is no sealing material applied to the exterior surfaces of the wheel, but there is no attempt made to confine the curd in a box or mold while it is expanding in the warm room during the eye development state.

In the curing of the curd in the warm room, there is no departure from the conventional wheel process, so far as the temperature and period in the warm room are concerned. The example disclosed in the Stine patent employs a conventional temperature of 74–76 degrees F. for approximately 25 days, which is also conventional. However, the patent teaches that the frequent repeated washing, scouring, salting, and turning operations in the warm room, required by the conventional wheel process, are not required in the Stine process.

In the conventional wheel Swiss process the finished wheel has a hard, inedible rind of about ½ inch in thickness, resulting from the brining, holding, and curing, during which the uncured cheese is turned and scrubbed with salt two or three times a week, increasing the dehydration and hardening. In the procedure taught by the Stine patent, the same type of rind-like surface is initially developed on the outside of the rectangular blocks of curd during the brining step. This hardening and dehydration continues when, after brining, the cheese is kept in the holding room for the period necessary to dry the surface. However, cheese which has been produced according to the Stine procedure at the end of the curing period is free from rind.

The transmutation of the hard, rind-like surface of the brined and dried curd into a soft material of practically the same texture as the interior of the block is due to the sealing of the surface of the block after the drying period by application of the fluid-proof coating prior to the curing stage, and curing of the sealed block in the confining form. The surface-sealing serves to inhibit the escape of moisture and carbon dioxide and the entry of air, and effects a gradual inward movement of salt from the outer layer into the interior of the block, accompanied by an outward movement of moisture from the interior of the block into the outer layer, so that the conditions as to salt, moisture, and conditions for the development of flavor and eyes more closely approach uniformity throughout the body of the curd than in the case of the conventionally cured cheese. In the conventional wheel Swiss, the softer interior portion of the cheese is enclosed in a layer or supporting shield of rind which gradually becomes harder during the curing operation. In the procedure under the Stine patent, the confining form operates to control the shape of the expanding cheese during the curing stage and as a casing or support for the sealed block.

The claims of the Stine Patent are as follows:

"1. The improvement in the art of making a body of natural cheese of the Swiss type which comprises applying a coat of extensible, flexible, fluid-proof sealing material to

the exterior surface of the uncured body to seal the surface of said body prior to eye development in a warm room, and curing the sealed body in the warm room while confining the body under controlled pressure within an expandable mold, said mold expanding during the curing operation under the internal pressure generated within said body by the curing process.

"2. The improvement in the art of making a body of natural cheese of the Swiss type, which comprises sealing the exterior surface of the uncured body prior to eye development in a warm room, enclosing the sealed body in a mold of such capacity that the body volume increase caused by the development of eyes within the body will cause the body to snugly fill said mold, and placing the enclosed sealed body in the warm room to effect the development of eyes.

"3. The improvement in the art of making a body of natural cheese of the Swiss type, which comprises applying a coat of flexible, fluid-proof, sealing material to the exterior surface of the uncured body prior to eye development in a warm room, enclosing the sealed body in a mold of such capacity that the body volume increase caused by the development of eyes will cause the body to snugly fill said mold, and placing the enclosed, sealed body in the warm room to effect the development of eyes.

"4. The improvement in the art of making a body of natural cheese of the Swiss type from cow's milk containing about 3.5% of fat, which comprises sealing the exterior surface of the uncured body prior to eye development in a warm room, enclosing the sealed body in a mold of such capacity that the body volume increase caused by the development of eyes within the body will cause the body to snugly fill said

mold, and placing the enclosed, sealed body in the warm room to effect the development of eyes."

Claim 2 of the Stine patent is directed to the following three steps in the process of making natural cheese of the Swiss type.

*Step 1*—Sealing the exterior surface of the uncured body prior to eye development in a warm room.

*Step 2*—Enclosing the sealed body in a mold of such capacity that the body volume increase caused by the development of eyes within the body will cause the body to snugly fill said mold.

*Step 3*—Placing the enclosed sealed body in a warm room to effect the development of eyes.

In Claim 3 the surface sealing is specifically defined as "applying a coat of flexible, fluid-proof, sealing material". The term "fluid" includes gases as well as moisture.

Claim 4 of the patent has the same wording as Claim 2, except that it specifies that the milk used contains about 3.5% of fat, which is the fat content of the milk used in the preferred example described in the patent.

Claim 1 has the same wording as Claim 3, *except* that step 2 involves the curing of the sealed body in the warm room while confined under controlled pressure within an expandable mold, the mold expanding during the curing operation under the internal pressure generated within said body by the curing process.

The specification and claims of the Stine patent adequately set forth the process of making natural rindless block Swiss cheese which was in successful commercial use by plaintiff shortly before June 15, 1946, the date when the application for the patent in suit was filed. They contain all information necessary to enable a Swiss cheesemaker of ordinary skill to make natural rindless block Swiss cheese.

Neither Stine, nor plaintiff, his assignee, during the prosecution of the ap-

plication for the patent in suit, made any statement or failed to make any statement, as a result of which the Patent Office was misled to the damage of the public.

There are many benefits and advantages in the use of the process of the Stine patent, over the production of Swiss cheese by the conventional wheel process, such as, the production of Swiss cheese without the hard, inedible rind; production in any desirable shape, preferably the rectangular shape, for the reason that Swiss cheese is usually merchandised in a rectangular loaf known as the sandwich cut; conversion to the sandwich cuts of the rectangular rindless Swiss cheese is done at a substantial saving as compared to the conversion of the wheel Swiss into sandwich cuts. It can be made in smaller sizes for commercial production as low as ten pound bricks.

The cheese made under the Stine process is free of surface defects, and in effect free of mold as compared to the mold normally found on Swiss cheese made and cured by the conventional process.

Shrinkage from moisture loss is reduced to about 3% as compared to a moisture loss of about 7% under the conventional method. The flavor, texture, and eye formation are more uniform throughout the body of the cheese than in the wheel Swiss.

Under the Stine process it is unnecessary to wash, salt and turn the blocks from two to three times a week as in the conventional wheel process. When no lids and weights are used the cheese made pursuant to the Stine process may be turned once or twice during the curing period to improve the shape of the block. Labor saving devices such as lift trucks may be used for handling the cheese made by the Stine process, which are not feasible with the large wheel Swiss.

During 1946 plaintiff produced at its Milledgeville, Illinois, factory more than one million pounds of rindless block Swiss cheese. As a result of its prompt public acceptance plaintiff expanded its production facilities to manufacture Swiss cheese under the Stine process. The annual pound production at plaintiff's plants under this process was:

1946 — 1,064,262
1947 — 2,837,852
1948 — 5,058,520
1949 — 9,189,097
1950 — 21,670,040
1951 — 32,343,225
1952 — 43,020,154

Some of the increase in sales and consumption of Swiss cheese could be attributed to the improvement in merchandising during that period, such as displaying packaged cheese in refrigerated display cases.

Production of Cheddar during the same period increased from 810,000,000 pounds in 1946 to 870,000,000 pounds in 1952. The production of Swiss, wheel and rindless, increased from 55,000,000 pounds in 1946 to 104,000,000 pounds in 1952, of which 43,020,000 pounds represented Kraft's production of rindless Swiss which was sold at a higher price than wheel Swiss.

This exceptional growth in rindless Swiss cheese production was not in any way due to advertising, which is evidence of the commercial success of the Stine invention.

Plaintiff made no expenditures for advertising or otherwise promoting the sale of rindless Swiss block cheese prior to 1950, when its production was more than 21,000,000 pounds per annum. The total expenditures by plaintiff for advertising rindless block Swiss cheese to the end of 1952 amounted to $26,186.44.

In marketing its rindless Swiss cheese Kraft has obtained a price from 2¢ to 6¢ per pound, more than the price obtained for wheel Swiss, sold through the same channels and under the same conditions. The sale of rindless Swiss has been extended into new markets which formerly did not handle the wheel Swiss, because of the distributing and retailing losses and difficulties involved in its handling.

In the year of 1946, plaintiff, in its owned or leased factories, produced 7,-800,786 pounds of Swiss cheese made by the conventional Emmenthaler process and bearing the hard outer layer of rind. By the end of March 1949, plaintiff ceased production of wheel Swiss cheese and has never resumed production thereof as a regular commercial operation, all of which is further proof of the commercial success of the Stine invention. Oliver United Filters Inc. v. Silver, 10 Cir., 1953, 206 F.2d 658.

The issuance of the patent immediately aroused the attention of the defendants and the entire Swiss cheese industry, and most of the defendants obtained copies of the patent.

In February of 1950, Arthur B. Erekson, an expert and a leader in the cheese industry, as enumerated in the 17 pages of the record relating to his qualifications as an expert, was the Director of Research for Lakeshire-Marty, owned by Bordens. He learned of the Stine patent in suit and promptly obtained a copy of it. On March 23, 1950, in an address he delivered to the Seminar on Foreign-type Cheeses at the University of Illinois, he stated that the Stine patent in suit, represented the most startling change in the Swiss cheese business for the past fifty years. At the time he made this statement he was exceptionally well qualified and informed with respect to the manufacture of Swiss cheese.

During the period of the alleged infringement, beginning October 13, 1950, Walther made the curd in a conventional manner, in which it was pressed and dressed in a rectangular form. On the following morning the block was cut into two blocks measuring 16 by 20 inches in size and weighing from about 80 to 100 pounds.

These blocks were brined in the usual manner that wheel Swiss cheese was brined; from 24 to 48 hours. After brining, the blocks were shelf dried from one to seven days, average two to three days, in a room at a temperature of 50 to 55 degrees F. At the end of the drying period the surface was hard and dry.

The blocks were then dipped into a bath of hot melted wax which was more elastic than ordinary paraffin. Each of the blocks was then wrapped in Parakote, a flexible, extensible, fluid-proof material, with overlapping seams and end folds heated with an electric iron so as to weld and seal the seams and folds. The wrapped and sealed blocks were then placed in rigid wooden boxes measuring about 16¼ inches by 20¼ inches by about 10 inches in depth. Sometimes the sealed blocks were held from two to seven days in the cold room. At other times they were placed in the hot room immediately after boxing. The hot room was at the same temperature as the usual hot room of the conventional wheel Swiss process.

The blocks were not turned preceding the hot room period. During the hot room period in some instances the blocks were removed from the boxes and turned several times, while in other instances they were not turned at all. In the hot room the eyes began to develop in about two weeks and the development was completed in about three weeks. By this time the block had swelled or expanded so that it snugly fitted within the box, and the rind which had been formed during the brining and drying steps had been converted into soft, edible cheese so the block became rindless as a result of the process.

The process used at the Walther factory at Platteville, Wisconsin, between October 13, 1950, and May 1952, for making rindless block Swiss cheese, employs each of the three steps of Claim 2, and is covered by Claim 2 of the patent in suit. The Walther process also employs each of the three steps of and is covered by Claim 3 of the Stine patent.

Borden learned that Kraft was producing natural rindless Swiss cheese, and on or about February 1, 1949, Borden hired one Jack Schlichting, who, until the previous month, had been employed by plain-

tiff, and, it is quite reasonable to infer that he undoubtedly knew something of the methods and process used by Kraft for making rindless Swiss, in that he and Fred Feutz, manager of Borden's Laboratory at Monroe, Wisconsin, promptly began to make rindless Swiss cheese, using the same procedure used by Kraft.

During the period of the alleged infringement in 1952, Borden made rindless block Swiss cheese at its Orangeville, Illinois, factory and at its Monroe, Wisconsin, laboratory. Borden followed the same process as used by Walther as above described, except that it used a different sealing procedure. The block of curd having been brined and dried in substantially the same manner as in the Walther operation; it was not dipped in wax or wrapped in Parakote. It was sealed by being wrapped in two layers of Pliofilm, the inner surfaces of each having been first coated with mineral oil, and by applying an outer wrapper of glassine. The block was wrapped with an overlapping seam at the top and shoebox folds at the ends, and after wrapping, the center seam was tacked with one piece of Scotch tape. A second wrapper of 40 gauge tensilized Pliofilm, similarly coated with mineral oil, was then applied to the exterior of the block in such manner that the top center seam of the second wrapper was at right angles to the center fold of the first wrapper. The center seam and the end folds of the second wrapper were also tacked with pieces of Scotch tape. The overlap of the center seams was intended to be from 4 to 5 inches. An outer wrap of glassine was then applied over the double Pliofilm wrap and the folds of this glassine wrapper were tacked with small pieces of Scotch tape. No mineral oil was used in connection with the glassine outer-wrap. The Pliofilm was flexible, extensible and fluid-proof. The purpose of using mineral oil was to cause the over-lapping seams and folds to stick together and thereby make a better seal than could be obtained without it.

The cheese produced by Borden with this procedure was rindless. The shape of the finished block was substantially rectangular, and snugly fit in the curing box when the curing process was completed.

The double wrap Pliofilm and mineral oil procedure employed by Borden in making natural rindless block Swiss cheese at Orangeville and Monroe, involves the use of the three basic steps of Claim 2, and is covered by Claim 2 of the Stine patent in suit.

All of the Swiss cheese produced at Wild after October 1950 was natural rindless block Swiss, which was sold commercially.

Commencing about May 15, 1950, and continuing up to the date of the inspection by the court and counsel on February 3, 1953, Wild has commercially produced natural rindless block Swiss cheese by the following process.

In some cases the milk used in the manufacture of the cheese contained approximately 3.5% of fat. The conventional Emmenthaler process was followed; cultures or starters and rennet were used.

The curd was netted, placed in a press form and handled in the same way as in the conventional Emmenthaler cheese process except that the form was rectangular instead of wheel shaped. The curd was held in form until the next morning when it was cut into two blocks weighing about 80 to 90 pounds each. The block was held in a cold room for one day and then the block was brined in the brine tank for from two to four days. The brined block was then held in the cold room for one to two days, at the end of which time the surface of the block was dry and hard. The dried block was trimmed with a knife and rubbed down with fine dry salt and wiped with a cloth

The block was then sealed by wrapping the block in Bakelite-type wrappers which were flexible, extensible, and fluid-proof, with shoe-box type end folds, and

the overlapping seam and end folds were then welded closed with an electric iron.

The sealed block was then overwrapped with a protective coat of glassine, the seams of which were also welded with an electric iron.

The sealed block was placed in a wooden box open at the top and of such size that the block could be inserted in the box. A loose lid was placed on the top of the wrapped block and the boxed block was held in a cold cellar for from four to ten days, and then placed in the warm room which was at a conventional temperature of about 70 degrees F.

The box was turned over twice a week in some cases. As the block started to expand, it was transferred into a second box slightly larger than the first box. The second box was 1½ inches longer and ¾ inch wider than the first box. When the glassine wrapper was ruptured due to the expansion of the block it was torn off and discarded. When the eye development in the warm room was complete, the block filled the box and assumed the shape of the box fitting the box snugly. The cheese thus produced was rindless Swiss cheese.

This process used by Wild employs each of the three steps of and is covered by said Claim 2 of the Stine patent. The process also employs each of the three steps of and is covered by Claim 3 of the Stine patent.

In the manufacture of this cheese by said process, the defendant Associations and the State of Wisconsin have aided and abetted Wild in producing rindless Swiss cheese.

■ The grant of letters patent is *prima facie* evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty. Cantrell v. Wallick, 117 U.S. 689, 695, 6 S.Ct. 970, 29 L.Ed. 1017.

That presumption of validity is greatly strengthened by the fact that the prior art relied on to invalidate the patent in suit has been considered and rejected by the U. S. Patent Office. In the Stine Application the prior art relied on by the defense was cited against Stine. It was also cited and relied on by the State in the Interference proceedings and rejected by the Patent Office. Hunt v. Armour & Co., 7 Cir., 1950, 185 F.2d 722, 726.

■ Where an inventor has successfully taken a step or made a development where others have tried and failed, and where the inventor in so doing has achieved for the first time a substantial commercial success, and has substantially advanced the art as Stine has done, then he is entitled to a liberal construction of the patent to secure to the inventor the reward which he deserves. Oliver United Filters, Inc., v. Silver, 10 Cir., 1953, 206 F.2d 658; Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Morley Sewing Machine Co. v. Lancaster, 129 U.S. 263, 277, 9 S.Ct. 299, 32 L.Ed. 715; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523.

Others, including Honer and Borden, struggled with the problem for many years without solving it. Stine took the final step which turned failure into success. "In the law of patents it is the last step that wins". The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 283, 12 S.Ct. 443, 36 L.Ed. 154; Oliver United Filters, Inc., v. Silver, 10 Cir., 206 F.2d 658, 667.

■ The defendants in an attempt to avoid infringement of the patent in suit have varied the details of the process as to the wrapping, sealing and the material used in their production of rindless Swiss cheese. The court finds that the Stine patent in suit is valid and that the defendants have infringed the claims thereof as hereinbefore set forth.

■ An infringement is not avoided by a mere reversal or transposition of parts or a mere change in form without change in function. Hunt v. Armour & Co., 7 Cir., 185 F.2d 722, 728.

In determining the question of infringement, the courts are not to judge about similarities or differences by the names of things, but are to look at the elements in the light of what they do or what office or function they perform, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way, to obtain the same results. Cantrell v. Wallick, 117 U.S. 689, 695, 6 S.Ct. 970, 29 L.Ed. 1017.

The test of infringement of the patent in suit is whether the accused process does the same work in substantially the same way, and accomplishes the same result. If two devices, two processes or procedures do the same work in substantially the same way and accomplish substantially the same result, they are the same even though they differ in name, form or shape. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Nordberg Mfg. Co. v. Woolery Machine Co., 7 Cir., 79 F.2d 685, 692; Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147.

As the Seventh Circuit said in Nordberg Mfg. Co. v. Woolery Machine Co., 1935, 79 F.2d 685, 692:

"The test of infringement is whether the accused device does substantially the same work in substantially the same way and accomplishes the same result. One appropriating the *principle* and *mode of operation* of a patent, and *obtaining its results by the same or equivalent means,* may not avoid infringement by making a device different in form, even though it be more or less efficient than the patented device."

A long unbroken line of authorities in Wisconsin has established the doctrine that:

"Municipalities, as well as the state itself, have long been held immune from liability for the tortious acts of their agents and officers while engaged in the discharge of a governmental function." Apfelbacher v. State, 160 Wis. 565, 152 N.W. 144, 146.

It is undisputed that the State in aiding and abetting Wild in its infringement activities was not engaged in a proprietary enterprise but was engaged in a governmental function, not for financial gain, but for the general welfare of its inhabitants.

The doctrine of *respondeat superior* does not apply to the State whereas in this instance it is exercising a governmental function.

The activities of the State of Wisconsin and its Department of Agriculture were purely experimental and not for commercial purposes and it is not liable to plaintiff for its activities in aiding Wild in its infringement of plaintiff's patent.

The plaintiff is entitled to an injunction against each of the defendants and each of the intervener-defendants restraining them and each of them from using, causing to be used, or inducing any other person to use any process which infringes said letters patent.

Plaintiff is entitled to an accounting to determine the amount of its damage by reason of the infringement of said patent by the defendants and the intervener-defendant Wild Cooperative Cheese Company.

Plaintiff is entitled to its costs herein.

Defendants are entitled to the costs incurred by them in their preparation of their defense to that part of the complaint relating to Patent No. 2,494,637, disclaimed by plaintiff at the opening of the trial and before any testimony was received.

The court's findings of fact and conclusions of law are filed herewith and judgment may be entered for the plaintiff in accordance therewith.