OLIVER UNITED FILTERS, Inc. v. SILVER.

No. 4574.

United States Court of Appeals Tenth Circuit.

July 23, 1953.

Oscar A. Mellin, San Francisco, Cal. (Pershing, Bosworth, Dick & Dawson, Winston S. Howard, Denver, Colo., Leroy Hanscom, and Jack E. Hursh, San Francisco, Cal., on the brief), for appellant.

James P. Hume, Chicago, Ill. (James A. Woods and Charles J. Beise, Denver, Colo., on the brief), for appellee.

Before HUXMAN, MURRAH and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

Harold F. Silver is the owner of U. S. Letters Patent No. 2,390,131 issued December 4, 1945 and No. 2,468,720 issued April 26, 1949. These patents disclose an apparatus and process for extracting sugar solution from sugar beets known to the art as continuous diffusion. Oliver United Filters, Inc.[1] brought this declaratory judgment action in which it prayed for a decree adjudging patent No. 2,390,131 invalid and not infringed by a machine built by Oliver and known as the "Morton Battery". Silver answered, and alleged that the patent was valid, and counterclaimed for the infringement of claims 1, 2, 4, 6, 8, 11, 12, and 13 of patent No. 2,390,131, and for the infringement of claims 2, 3, 4, 6, 7, 9, 10, and 11 of patent No. 2,468,720. Upon trial the case took the form of the usual infringement action with the conventional defenses of invalidity and non-infringement. This is an appeal from a judgment holding the patents in suit valid and infringed.

As to the validity of the Silver patents it is contended here as it was in the district court, that they added nothing new to the art; that all Silver did was to design a machine which differed from the prior art

1. The parties will be referred to as Silver and Oliver.

only in minor construction details; that his machine did not meet the required standards for inventions; and that it was no more than the application of unpatentable mechanical skill. As to the infringement by the accused Morton machine, it said that this machine follows the teachings of the prior art and not the teachings in the Silver patents.

Sugar beets were first grown in commercial quantities in Europe early in the Nineteenth Century. In the latter part of that century it was found that they could be produced profitably in the Midwestern, Rocky Mountain and Pacific Coast areas of the United States. Since the advent of the beet sugar industry, the extraction of sugar from beets has been effected by a process of diffusion which is accomplished by bringing hot water into contact with the beets after they have been sliced, and by causing the sugar content of the beets to pass into solution in the water to form a juice from which commercial beet sugar is refined. This process has been used exclusively in the industry because of the nature and structure of the beet stock which does not permit juice extraction by pressing or other forceful removal as is used in removing juice from sugar cane. The technical and physical law relating to diffusion was known long before the development of the beet sugar industry.

To extract the sugar from sugar beets the latter are sliced into pieces of the shape and size resembling shoestring potatoes. These pieces are referred to in the art as "cossettes". The diffusion is accomplished by submerging and agitating the cossettes in heated water or juice of a concentration less than that of the juice or sugar contained in the beet cells. When the concentration of fluid in which the cossettes are submerged becomes equal in sugar content to that of the cossettes the diffusion ceases and for further diffusion it is necessary that the cossettes be exposed to a juice of less concentration. In order to expose the cossettes containing the highest concentration of sugar, to juice of high sugar content, there must be a progressive movement of the juice, or of both the cossettes and juice. This requires a countercurrent movement

in that the fresh water first processes the most depleted cossettes, and then progressively processes cossettes of lesser depletion, until at the end of the treatment the cossettes which are least depleted of sugar are submerged in juice most heavily laden with sugar. The result sought is the recovery of the highest possible percentage of the sugar content of the beets in juice form which will contain a minimum of impurities. The high cost of evaporating water and recovering the solid sugar from the juice demands that the diffusing activities be carried out with a minimum of water.

Prior to Silver's inventions, the only commercially successful process and apparatus known to the industry was the "Robert Battery" of French design about a century ago. This battery is a batch-type apparatus consisting of a series of separate but connected tanks or cells (usually fourteen), each of which is adapted to contain a batch of cossettes. In actual operation only twelve of the cells are included in the diffusion process at any one time. The thirteenth cell of the battery is being filled with fresh cossettes while the fourteenth is being emptied of exhausted cossettes. Water of proper temperature passes successively through each cell of the series which is in operation until cossettes of the first cell become exhausted of sugar after which this cell is manually discharged. The inlet and outlet pipes are adjusted to correspondingly and successively shift the location of the particular cell in the series where the pure water enters and the juice leaves the operative portion of the battery. Cell thirteen then becomes the last in the diffusion process and cell two becomes the first. Although reliable, this type of battery is cumbersome and relatively inefficient. It requires a large number of men to operate it and the water content of the juice is high.

Workers in the prior art recognized the advantages of continuous diffusion through a direct countercurrent or a countercurrent-concurrent flow system. The countercurrent-concurrent flow is a method whereby the cossettes moving in one direction through the battery are exposed continuously to water or juice of proper concen-

tration flowing generally in the opposite direction but concurrently within each cell. In this system, the exhausted cossettes are discharged at one end and the raw juice at the other. Both in Europe and in the United States inventors were unable to devise a successful machine for such a system. A number of patents were issued, but none were successful or in use in North America.[2]

When Silver entered the field, the "Robert Battery" was being used exclusively in the United States and Canada. It is the only method in use today except in those factories which are now equipped with the Silver machine and two which use the accused machine. It had been the predominating view of technical workers that any countercurrent system would not succeed. The straight countercurrent method presented a problem of clogging and mutilation of the cossettes which could not be overcome. The countercurrent-concurrent system eliminated the clogging difficulties but created other deficiencies. The density of the cossettes varied, some floated, and some sank in the fluid. The fact that the cossettes and juice flowed concurrently resulted in a less effective washing and inefficient diffusion. When transferred from one cell to another the cossettes carried with them a substantial quantity of juice which was of a higher concentration of sugar than that of the juice in the cell into which they were being transferred and the equality of sugar content in the beets and juice tended to defeat diffusion. Some inventors sought unsuccessfully to overcome this with presses and other methods of enforced separation.[3] After many attempts, the problem of producing a commercially successful continuous diffusion system remained wholly unsolved.

Silver undertook to develop a countercurrent-concurrent type of machine which would overcome previous failures and be commercially practical for a successful continuous diffusion operation. His patents disclose a number of separate vertically disposed U-shaped cells, each having parallel downward and upward legs connected at their bottoms. These cells contain the juice or diffusion fluid at a prescribed level. A continuous conveyor chain carrying perforated trays which contain the cossettes travels alternately down into one leg and up the other of each cell successively through the entire length of the battery, thereby enforcing a submergence in the juice of each cell. Although the juice within each cell travels by gravity in the same direction as the cossettes, it is further propelled by the movement of the chain and the cossettes. This propelling force causes a certain gravitational pull of the juices against the cossettes, and results in a more effective washing. Although the travel of the two is not strictly countercurrent, nevertheless the propelling force results in some friction between the juice and cossettes. As the chain conveying the cossettes comes out of the liquid, there is a draining of the cossettes which prevents the backward conveyance of the higher concentrated juices. Thus Silver's apparatus in the main employs progressive and continuous separate cell treatment stages; a forced submergence of all the cossettes, regardless of their density; and a greater frictional washing plus an effective draining of the cossettes, rather than a forceful extraction. A further process improvement provides for the discharging of the juice from each cell by screening the same through an enlarged outlet located near to but actually below the surface of the liquid level in each cell. The screening takes place as the juice leaves each cell to travel by gravity to the next succeeding treatment stage. This improvement along with others was not claimed until Silver's second patent.

2. In Europe, a continuous diffusion process known as the "Berge Battery" was used to a limited extent. The mechanism of this battery was entirely different from the Silver or Morton type. It did not employ a countercurrent-concurrent system.

3. 755,546 (U.S.) Rak, March 22, 1904; 1,006,311 (U.S.) Steffen, October 17, 1911; 1,492,656 (U.S.) Turrentine, May 6, 1924; 558,547 (German) Neufeldt, September 8, 1932; 157,710 (Austrian) Krauss, January 10, 1940.

■ Silver does not contend that he originated any one of the elemental parts or steps of his inventions. He urges, and the patent office agreed, that he was the first to conceive of the use of the combination which is employed in his apparatus and process, and that his invention is in the combination and not in the elements. He readily concedes that all the elements of his combination were known to the art long prior to his inventions but contends that his combination is new. The law is that a combination of old elements is patentable if it accomplishes either a new or an old result, "in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems." Harris v. National Machine Works, Inc., 10 Cir., 171 F.2d 85, 88, certiorari denied 336 U.S. 905, 69 S.Ct. 491, 93 L.Ed. 1070; Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct. 652, 53 L.Ed. 1034; Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 332, 29 S.Ct. 503, 53 L.Ed. 816; Williams v. Hughes Tool Co., 10 Cir., 186 F.2d 278, 281, certiorari denied 341 U.S. 903, 71 S.Ct. 612, 95 L.Ed. 1342; Haynes Stellite Co. v. Osage Metal Co., Inc., 10 Cir., 110 F.2d 11, 15; Williams Iron Works Co. v. Hughes Tool Co., 10 Cir., 109 F.2d 500, 506, 512. In Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, it was said that, "The function of a patent is to add to the sum of useful knowledge", and that to constitute invention, "The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable."

We come then to the question of what Silver has contributed to the art that constitutes patentable inventions. He first undertook to analyze and discover why the countercurrent-concurrent type of diffusion system had not been successful. The claimed patentability lies in the method or process by which the beet stock is made to move in the alternate downward and upward course of travel to cause an enforced submergence in the countercurrent of the juice in a manner to effect an alternate washing, draining, and transfer from one cell to the next without mutilating the cossettes as they move through the course of treatment. The application of force or pressure to the cossettes is avoided so that they remain unmutilated and in good condition for diffusion activity and thereby retain most of the impurities. In this draining process the juice of high concentration, including the diffusion resistant surface films found on the cossettes, is removed and it returns to the cell of relatively high juice concentration from which it was taken. The district court found that the enforced submergence of the cossettes from above the diffusion liquid with a downward and upward movement while submerged, followed by a drainage of the liquid in that cell before transfer to the next cell made Silver's machine different from those disclosed by the prior art.[4]

**4.** The pertinent findings are:

"14. Silver, in making his inventions, combined with the countercurrent-concurrent flow system the following major features:

"First: The enforced submergence of the cossettes by causing them to pass from a point above the level of the juice to a point below the level of the juice by giving the cossettes a downward and upward course of movement with respect to the juice level; and

"Second: A substantial separation of the cossettes and their associated liquid at the time the cossettes are transferred from one cell to the next without the utilization of such force as would mash or damage the cossettes or interfere with the diffusion activity.

"15. The substantial separation of the cossettes and their associated liquid at the time the cossettes are transferred from one cell to the next was an unsolved problem in the prior art when Silver entered the field. Prior art practices seeking to separate the cossettes from their associated liquid employed force or pressure in expelling the liquid, and thereby forced undesirable non-sugar substances into the juice and mashed and damaged the cossettes to an extent impairing good diffusion activity.

"16. The two Silver patents in suit disclosed enforced submergence of the cossettes by establishing a gravitational flow of the juice from cell to cell in a relatively non-foaming, quiescent condi-

It is often difficult to determine whether an improvement reaches the dignity of an invention or is merely the work of a mechanic skilled in the art. The fact that the process is simple in a rather crowded art is not important if the improvement by combination contributes something more than mechanical skill. Expanded Metal Co. v. Bradford, supra; Harris v. National Machine Works, supra.[5] The courts may examine into the art to determine if the alleged discovery or invention has substantially advanced the art. If it has done so, there should be a liberal construction of the patent to secure to the inventor the reward which he deserves. This is especially true when for the first time there has been commercial success of the invention. Commercial success in itself is not sufficient to sustain a patent but it is evidence of its

tion, while at the same time forcing the cossettes through a path of movement which originates above the liquid level in each cell, respectively, and passes downwardly to a point below the surface of the liquid level and into intimate diffusion relationship with the liquid, and thence upwardly to a point above the liquid where a substantial and effective draining occurs.

"17. Although some of the elements constituting the combination invented by Silver may have been old, the combination thereof was new and useful, and Silver was the original, first, and sole inventor of both the process disclosed and claimed in his Letters Patent No. 2,390,131, and the apparatus and process disclosed and claimed in his Letters Patent No. 2,468,720. The new combinations in the process and apparatus employ a new mode of operation and produce a new and improved result over anything existing in the prior art." See also the opinion of the district court in this case reported in 103 F.Supp. 935.

5. Speaking on this subject the Supreme Court said in the Expanded Metal Case, 214 U.S. at page 381, 29 S.Ct. at page 655, 53 L.Ed. 1034. "It is suggested that Golding's improvement, while a step forward, is nevertheless only such as a mechanic skilled in the art, with the previous inventions before him, would readily take; and that the invention is devoid of patentable novelty. It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor. There is nothing in the prior art that suggests the combined operation of the Golding patent in suit. It is perfectly well settled that a new combination of elements, old in themselves, but which produce a new and useful result, entitles the inventor to the protection of a patent. Webster Loom Company v. Higgins, 105 U.S. 580–591.

We said in the Harris Case, 171 F.2d at page 88: "At the time Gerner conceived his device, sleeves containing spaced bearings and oil seals were well known in the art. Moreover, viewed in retrospect, Gerner's conception seems comparatively simple. But, a new combination of old elements may amount to invention and the fact that, viewed in retrospect, a conception seems simple, does not justify denial of inventive genius where the need for the device long existed and the solution of the problem did not occur either to mechanics skilled in the art or to experts in the automotive engineering field. The facts are that prior to Gerner's device mechanics skilled in the art had been repairing worn drive shafts and worn drive shaft bearings in Chevrolet automobiles and GMC trucks by the only known method; and, notwithstanding repair by that method was more difficult, took substantially longer, and cost substantially more than repair with Gerner's device, the Gerner conception apparently never occurred to such mechanics. Gerner's device enjoyed immediate and substantial financial success. While it is a combination of old elements, it accomplishes, if not a new, an old result in a more facile, economical, and efficient way in a particular environment which presented peculiar and difficult problems." (Footnotes omitted). See also Krementz v. S. Cottle Co., 148 U.S. 556, 13 S.Ct. 719, 37 L.Ed. 558; Washburn & Moen Mfg. Co. v. Beat 'Em All Barb-Wire Co., (The Barbed Wire Patent,) 143 U.S. 275, 12 S.Ct. 443, 36 L. Ed. 161.

validity and in doubtful cases may be the deciding factor. Temco Electric Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 48 S.Ct. 170, 72 L.Ed. 298; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523; Scilken v. Leonard's Catering, 2 Cir., 149 F.2d 682; Bramlett v. National Unit Corp., 9 Cir., 104 F.2d 17; Baumgarten v. Coe, 67 App.D.C. 97, 89 F.2d 841; Artcraft Silk Hosiery Mills v. Gotham S. Hosiery Co., 3 Cir., 72 F.2d 47, certiorari denied 293 U.S. 595, 55 S.Ct. 109, 79 L.Ed. 688. Great A. & P. Tea Company v. Supermarket Corp., supra, is not to the contrary. The parties here concede that the problem confronting the workers in the art was difficult and that the need of the device long existed. The fact that Silver has contributed substantially to the solution of the problem is inescapable. He has given to the beet sugar industry, for the first time in its history, a continuous diffuser which works. Surely, if after almost one hundred years all the prior effort to overcome the difficulties of diffusion in the industry failed, it cannot be said that Silver's efforts were only the result of mechanical skill in assembling known elements. Invalidity of a combination patent may not be established by showing that the different elements making up the combination are old. As hereinbefore stated, if the combination produces a new and useful result it is a proper subject of a patent. We think that the trial court's finding that Silver's patents disclosed "New combinations in the process and apparatus" which "employ a new mode of operation and produce a new and improved result over anything existing in the prior art" is sustained by the evidence and not clearly erroneous. This is especially true in view of the presumption that a duly issued patent is valid. This presumption is overcome only by clear and convincing evidence. Referring to the evidence necessary to overcome this presumption we said in Insul-Wool Insulation Corp. v. Home Insulation Inc., 10 Cir., 176 F.2d 502, 505, that " * * * throughout all the cases runs the concept that the proof must be more than a dubious preponderance—it must be strong, clear and convincing." Radio Corp. of America v. Radio Engineer-

ing Laboratories, 293 U.S. 1, 54 S.Ct. 752, 78 L.Ed. 1453; Eibel Process Co. v. Minnesota & Ontario Paper Co., supra; Harris v. National Machine Works, supra; Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, certiorari denied 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430.

Oliver cites a number of patents which it is urged anticipated Silver's inventions. We need not discuss the prior art patents in detail as none of them taught a combination of steps which solved the problem of continuous diffusion. This defense is limited to eight patents, namely, 755,546 (U.S.) Rak, March 22, 1904; 1,006,311 (U.S.) Steffen, October 17, 1911; 1,492,656 (U.S.) Turrentine, May 6, 1924; 1,523,277 (U.S.) Olier, January 13, 1925; 510,642 (French) Dobler, September 10, 1920; 592,983 (French) Gazagne, May 13, 1925; 558,547 (German) Neufeldt, September 8, 1932; 157,710 (Austrian) Krauss, January 10, 1940. We agree with the trial court that the claims of the two Silver patents in suit were not anticipated by any one or more of these prior art patents. Rak, Steffen, Turrentine, Neufeldt and Krauss provide for a countercurrent-concurrent flow system but each employs an enforced separation of juice from the cossettes between each treatment stage with the use of presses, centrifuges or vacuum filters. These processes have a tendency to destroy the cellular structure of the cossettes and to defeat diffusion. Gazagne shows a countercurrent-concurrent system with a series of troughs arranged one above the other. The cossettes start at the top and pass downwardly through the troughs by gravity. The juice is forced upward by ejectors. There is no drainage of the cossettes as contemplated by the Silver machine, and the ejectors would cause foaming which would defeat the operation. The Olier and Dobler patents show straight countercurrent flow systems and do not teach the countercurrent-concurrent method disclosed in the Silver machine. No successful machine or apparatus was ever manufactured under these patents and no worker in the prior art before Silver, ever devised a successful combination of the teachings of the prior art. Before declaring Silver's claims pat-

entable, the patent office gave close and careful scrutiny to all the cited patents except Dobler, and recognized the principles which they taught and which were used by Silver in his combination. This creates a presumption of priority and novelty. Radio Corp. of America Laboratories, supra; Hildreth v. Mastoras, 257 U.S. 27, 32, 42 S. Ct. 20, 66 L.Ed. 112; Insul-Wool Insulation Corp. v. Home Insulation, Inc., supra; Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 98 F.2d 999, certiorari denied 305 U.S. 662, 59 S.Ct. 364, 83 L.Ed. 430; Hunt v. Armour & Co., 7 Cir., 185 F.2d 722; Lewyt Corp. v. Health-Mor Inc., 7 Cir., 181 F.2d 855, certiorari denied 340 U.S. 823, 71 S.Ct. 57, 95 L.Ed. 605; Reynolds v. Whitin Machine Works, 4 Cir., 167 F.2d 78, certiorari denied 334 U.S. 844, 68 S.Ct. 1513, 92 L.Ed. 1768.

Oliver strenuously insists that Silver, to avoid the prior art and to obtain his patents, expressly disclaimed methods and processes in which the cossettes flow through horizontally disposed cells and may not now contend that his patent claims include such methods and processes. It is obvious that the patent office gave careful consideration to Silver's applications when comparing it to the prior art. It rejected the original claims, and the claims which were finally accepted limit the process to one in which each treatment stage includes alternate downward and upward courses of cossette travel within the diffusion fluid. It is urged that the reference to the upward and downward courses means a physical disposition of the U-shaped cells with an endless chain type conveyor. It seems quite clear that this is not what the patent office had in mind when the claims were rejected, as such cells and conveyors were disclosed in the Olier, Rak and Krauss patents, and if it had been the intention of Silver and the patent office to limit the process to vertically disposed cells, the claim would have been disallowed because of the teachings of those patents.

The language cited is found in the process claims and refers to the movement of the cossettes through the diffusion fluid in each stage of the process. Its reference is not to any particular mechanism or disposition of mechanism. In his first patent specification Silver said in referring to the vertical disposition of the cells, "While this is a preferred arrangement, it will be understood that the process also may be performed in cells disposed horizontally with a positive or gravity circulation of liquid employed." Silver's process differs from the prior art in that it provides for a combination of steps which adds enforced submergence of the cossettes coupled with simple and effective drainage to the countercurrent-concurrent flow system. The evidence shows that it is these steps which resulted in the success of the Silver method and the lack of which caused the failure of the prior art. We are of the view that the trial court was correct in holding that Silver did not exclude from his patents, claims providing for processes or apparatus having horizontally disposed treatment zones and that there was no file wrapper estoppel.

We are not impressed with the contention that the Morton Battery follows the prior art and not the teachings of the Silver machine. The accused machine was designed by Whipple Vincent Morton who had been in the employ of Spreckles Sugar Company in California for many years. This battery consists of a series of horizontally disposed cells through which the cossettes and juice are moved in a countercurrent-concurrent flow by means of a scroll conveyor. At the end of each cell the cossettes are lifted out of the juice and transferred to the next cell by means of a fork-like tool which rotates on the scroll shaft. The juice is screened at the end of the cell into a juice box and flows on from there by gravity to the next treatment stage. This screening and lifting of the cossettes from the juice for transfer provides the same effective drainage as the original Silver mechanism.[6] It is true that

6. The first eleven installations made by Silver were of the vertical U-shaped cell type with the continuous chain conveyor. Beginning in 1946 Silver set out to simplify his conveyance. In 1947 and 1948 a scroll type conveyor in a horizontal cell was tested at a factory of the Union Sugar Company at Betteravia, California.

Morton, as did Silver, followed the prior art in the structural design of his battery as to different elements in a combination, but in addition each step in his process can be found in Silver's claims. He has eliminated vacuum filters and centrifuge or pulp presses between cells. He has established a method wherein exactly the same draining action before the transfer of the cossettes from cell to cell, occurs as in the Silver Battery. His process, like the Silver method, eliminated the clogging and injury to the cossettes which were the principal causes for the failure of the previous countercurrent batteries. He found in the Silver method a successful way to drain cossettes after each treatment and to transfer the juice from one cell to another to accomplish proper diffusion. The transfer of the cossettes from one cell to another and the rotation of the open scroll mechanism in the Morton machine effected an enforced submergence of the cossettes and an alternate upward and downward movement of them in the juice which furnished the necessary washing for effective diffusion. For many years prior to the construction of the accused machine, Morton, with all the prior art before him, had attempted to devise a successful continuous diffusion system and had obtained a patent [7] for such a machine which was not commercially successful. It was not until after he knew of Silver's inventions and was aware of their functional and commercial success that he was able to produce a successful battery. His battery performs the same work in substantially the same manner and accomplishes the same results as the Silver battery. This constitutes infringement. Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Company, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097; Sanitary Refrigerator Company v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147.

It is further contended that Silver's second patent offends the rule against double patenting. The application for Pat-

ent No. 2,468,720 was pending when Patent No. 2,390,321 was issued. If the second application or patent discloses or claims matter distinct from and not included in the first patent or application, it is patentable even though the applications are co-pending. In other words, if the second Silver patent defines a process or apparatus different from the discoveries of the first patent, it does not constitute double patenting even though it relates to the same invention. Jordan v. Hemphill Co., 4 Cir., 180 F.2d 457; B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 1 Cir., 122 F.2d 900, certiorari denied 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 219; General Motors Corp. v. Rubsam Corp., 6 Cir., 65 F.2d 217, certiorari denied 290 U.S. 688, 54 S.Ct. 123, 78 L.Ed. 593; In re Thompson, 62 F.2d 90, 20 C.C.P.A., Patents, 725; In re Peiler, 56 F.2d 878, 19 C.C.P.A., Patents, 1051. The basic reason for the rule against double patenting is that a later patent for the same invention will not operate to extend the period of monopoly created by the first patent. Miller v. Eagle Mfg. Co., 151 U.S. 186, 198, 14 S.Ct. 310, 38 L.Ed. 121.

The process in the Silver's second patent refers to the method of withdrawal of juice from the cell and the drainage of the cossettes. It provides for perforated trays which permit a drainage of cossettes on trays while submerged and moving upward in the diffusion juice. This enables the process to get a higher draining capacity and the withdrawal of the juice from the cell through a rotating submerged screen which extends the entire length of the cell. We agree with the trial court that the process claimed for the second patent covers improvement features in the process not disclosed in the first patent and the issuance of the second patent did not violate the rule against double patenting. When two applications are copending in the patent office involving the same subject matter, it is immaterial which of the patents is issued first if the claims are for separate inventions. Miller v. Eagle Mfg. Co.,

---

This test proved successful and the last three installations by Silver in the United States and Canada have been of that type.

7. U. S. Patent 2466259. This is the Berge type of diffuser. Morton did not develop his scroll type diffuser until early in 1948.

supra; Clark Stek-O Corp. v. Carpenter-Hiatt Sales Co., 2 Cir., 55 F.2d 218; Traitel Marble Co. v. U. T. Hungerford Brass & Copper Co., 2 Cir., 22 F.2d 259.

The questions in this case are close. The difference between the Silver apparatus and the prior art is not a radical one but the stubborn fact is that inventors, including Morton, struggled with the problem for years without solving it. Silver took the final step which turned failure into success, and "in the law of patents it is the last step that wins." The Barbed Wire Patent, 143 U. S. 275, 283, 12 S.Ct. 443, 446, 36 L.Ed. 154.[8] Considering all the facts and circumstances shown by the record, we are of the view that the findings and conclusions of the District Court are not clearly erroneous.

Judgment affirmed.

## FORT WORTH & DENVER CITY RY. CO. v. SMITH.

### No. 14135.

United States Court of Appeals
Fifth Circuit.

Aug. 18, 1953.

Rehearing Denied Oct. 8, 1953.

---

8. In the Barbed Wire Patent Case, the Court also uses this applicable language, 143 U.S. at page 283, 12 S.Ct. at page 446, 36 L.Ed. 154:

"There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp. Conspicuous among these is the case of [Webster] Loom Company v. Higgins, 105 U.S. 580, 591, [26 L.Ed. 1177] where an improvement in looms for weaving pile fabrics, consisting of such a new combination of known devices as to give to a loom the capacity of weaving 50 yards of carpet a day, when before it could only weave 40, was held to be patentable. It was said by the court, in answer to the argument that the combination was a mere aggregation of old and well-known devices, that 'this argument would be sound if the combination claimed by Webster was an obvious one for attaining the advantages proposed,—one which would occur to any mechanic skilled in the art. But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. * * * Now

H. M. Muse, Stanley C. Kirk, Wichita Falls, Tex., Seth Barwise, Fort Worth, Tex., for appellant.

Bob L. Wilson, Philip S. Kouri, Wichita Falls, Tex., for appellee.

Before HOLMES, BORAH, and RUSSELL, Circuit Judges.

that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' "