**SHIELDS-JETCO, INC., Jetco, Inc. and Tulsa-Jetco, Inc.**

**v.**

**Emanuel TORTI.**

**Civ. A. No. 3904.**

United States District Court, D. Rhode Island.

July 15, 1970.

Thomas D. Gidley, of Hinckley, Allen, Salisbury & Parsons, Providence, R. I., Thomas A. Harwood, of Kanz, Glaser & Harwood, John Feather, of Stroud & Smith, Pat McDowell, of Maloney, Milner & McDowell, Dallas, Tex., for plaintiffs.

Elliot A. Salter, and Leonard Michaelson, of Salter & Michaelson, Providence, R. I., for defendant.

## OPINION

PETTINE, District Judge.

This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 seeking an adjudication of non-validity and non-infringement of defendant's patent and a finding of patent misuse. In denying misuse and invalidity, the defendant has counterclaimed for infringement, seeking an injunction and an accounting.

Jurisdiction of the court is based on 28 U.S.C. § 1338.

Shields-Jetco, Inc., is a Texas corporation having a place of business in Dallas, Texas; Jetco, Inc., is a California corporation having a place of business in Alhambra, California, and Tulsa-Jetco, Inc., is a corporation existing and doing business under the laws of Oklahoma.

The defendant is a Rhode Island resident doing business in Providence, Rhode Island.

### Findings of Fact and Conclusions of Law

The patent, hereinafter referred to as the Torti Patent, which has been the sole property of the defendant at all times since its date of grant is U.S. Patent No. 3,089,310 entitled "Trench Shoring Machine" issued on May 14, 1963.

In January of 1968, the defendant filed a patent infringement complaint in the United States District Court for the District of South Carolina against one of the plaintiffs' customers, Charleston Constructors, Inc., charging it with using a trenching machine purchased from the plaintiff Shields-Jetco, Inc., which infringed his patent. In March of 1968, the instant action was filed.

## The Torti Patent

The Torti patent in question relates to a trench shoring machine which can be used so as to eliminate the repeated construction of retaining and shoring walls when digging a trench. It is designed to protect the workers while they are laying pipe in the trench before it is refilled. Basically, the apparatus comprises a pair of telescoping members, each having rigid side and top walls. The inner member is supported by the outer member and said members have cooperating guide means which permit the inner member to slide outwardly from the outer member, in which position the machine is in its expanded position, and then inwardly back into the outer member, at which point the inner member is nested within the outer member, and the machine is in its retracted position. Power means interconnect said members, which power means may be operated to extend or retract the members with respect to each other. The inner member has an end wall which is adapted to engage backfill in the trench, so that with the said end wall against the backfill, and with the inner and outer members in their nested position, operation of the power means to extend the apparatus will cause the outer member to propel forwardly along the trench. Reversal of the power means will then retract the inner member back into the now advanced outer member, after which backfill is again introduced at the rear of the machine and the cycle of operation repeated. Thus the apparatus self-propels along the trench, working off backfill at the rear of the machine, and workmen working within the confines of the apparatus are at all times protected against cave-ins.

The Torti patent is characterized by a construction of rugged rigid plates with a top wall, so to speak, affording the pipe layers true protection overhead from falling objects as well as laterally and overhead from cave-ins, and definitely defined guide means between the sections.[1]

1. The elements of each claim are as follows:

### CLAIM 1
1. A pair of hollow telescopically associated members each having rigid side and top walls.
2. One of said members being an outer member adapted to receive the inner member therein in nested relationship.
3. Said members having opposing wall surfaces one of which carries guide channels and the other of which has cooperating elements received therein for guided movement and at the same time supporting the inner member by the outer member.
4. A plurality of power operated cylinders operatively interconnecting said members.
5. Control means for selectively simultaneously and individually to operate said cylinders to effect relative movement of said members to an extended and then to a nested relationship.
6. Said inner member having one end wall rigidly joining said side and top walls and engaging back-fill to effect the aforesaid relative movement.

### CLAIM 2
1. A pair of hollow telescopically associated members each having rigid side and top walls.
2. One of said members being an outer member adapted to receive the inner member therein in nested relationship.
3. Said outer member having bottom skids.
4. Said members having opposing wall surfaces, one of which has guide channels longitudinally mounted thereon and slidably receiving therein guide rails which are longitudinally mounted on the other opposing surface.
5. Said channels and rails supporting the inner member by the outer member.
6. Power operated cylinders operatively interconnecting said members.
7. Control means for operating said cylinders to effect relative extension and nesting of the members.
8. Said inner member having one end wall rigidly joining said side and top walls and engaging back-fill to effect the aforesaid relative movement.

### CLAIM 3
1. A pair of hollow telescopically associated members each having rigid side and top walls.
2. One of said members being an outer member adapted to receive the inner member therein in nested relationship.
3. Said outer member having bottom skids.

Though the record lacks the clarity the court would enjoy, it does appear with sufficient certainty that seven machines were built by the defendant, some of which sold for approximately $22,000 each while others were originally licensed on a linear foot basis. The plaintiffs have built and sold approximately 15 to 18 machines.

### Validity

The plaintiffs contend that the Torti patent is invalid for two reasons:

1. The claimed invention lacks novelty (35 U.S.C. § 102(b)).
2. The claimed invention fails to meet the standard of non-obviousness (35 U.S.C. § 103).

If the prior art teaches all of the elements of the patent claim which is in litigation, then it lacks novelty and is therefore invalid. It is also true that the claimed advance over the prior art must be something that would not have been obvious to someone reasonably skilled in the art. Obviously if the plaintiffs are correct on either of these two points, the Torti patent is invalid and this court need not consider the infringement and misuse issues.[2]

▪ There is a presumption of validity (35 U.S.C. § 282) with respect to any patent, which arises from the fact of its issuance after careful study by the Patent Office. This presumption is strongest whenever a claim of invalidity is based upon the precise prior art which was before the patent examiner prior to issuance. It is clear, moreover, and the parties here agree that one who asserts invalidity has the burden of proof by clear and convincing evidence. See e. g. Colgate-Palmolive Co. v. Carter Products, Inc., 230 F.2d 855 (4th Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L. Ed.2d 59 (1956), and cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957); Scaramucci v. Dresser Industries, Inc., 427 F.2d 1309 (10th Cir. 1970).

4. Said members having opposing wall surfaces having guide channel and guide rail means cooperatively mounted thereon for relative slidable movement and to support said inner member by said outer member.
5. Power operated means operatively interconnecting said members to effect relative movement therebetween to an extended and then to a nested relationship.
6. Said inner member having one end wall rigidly joining said side and top walls and engaging back-fill to effect the aforesaid relative movement.

#### CLAIM 4

1. A pair of hollow telescopically associated members each having rigid side and top walls.
2. One of said members being an outer member adapted to receive the inner member therein in nested relationship.
3. Said outer member having bottom skids.
4. Said outer member having guide rails longitudinally rigidly mounted on the inside thereof.
5. Said inner member having cooperative guide channels longtitudinally mounted on the outside thereof and slidably receiving said guide rails therein to support said inner member thereon.
6. Power operated means operatively interconnecting said members to effect relative movement therebetween to an extended and then to a nested relationship.
7. Said inner member having one end wall rigidly joining said side and top walls and engaging back-fill to effect the aforesaid relative movement.

These claims are generally similar in scope. Claim 1 is somewhat broader in scope than claim 2 through 4, since claim 1 does not include the limitation that the outer member is provided with bottom skids, which limitation does appear in claims 2 through 4. On the other hand the co-operating guide means on the inner and outer members are defined in slightly different language in the various claims; and, in this connection, it will be noted that claims 1 and 3 are the broadest insofar as this particular structure is concerned. The four claims are sufficiently similar in scope so that all of them are valid and/or infringed or none of them are valid and/or infringed.

2. The third basic requirement for patent validity—utility—is not in issue in this case.

*Alleged Combination Patent*

▇▇▇▇ The thrust of the plaintiffs' position is found in the prior art disclosures of United States Patent No. 2,908,140 (Everson "Trench Shoring Apparatus") and United States Patent No. 2,866,320 (Bazzell "Trench Tunnel"). The plaintiffs' first contention is that the Torti invention is a combination of Everson and Bazzell which, however, is invalid as a combination patent because it is obvious to one ordinarily skilled in the art of trench shoring to combine the two, and also because the combination does not produce a synergistic result, under Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969). However, a combination patent is one which is based upon a number of elements which are separately disclosed in the prior art. This court finds that each claim of the Torti patent contains at least one element which is disclosed nowhere in the prior art, and therefore its validity is not to be measured by the "synergistic" test, which is applied solely to combination patents. That new element is the structure and function of the telescoping members. The plaintiffs claim that these members are disclosed by the teaching of the Everson device, yet Everson, which was never constructed and perhaps would never work, as testified to by the defendant's expert, differs in many important respects from the Torti invention.

First of all, it does not teach or even suggest the provision of inner and outer telescoping members, each having rigid sides for shoring the walls of a trench and means for expanding and retracting the sections with respect to each other, so that men working in the confines of the apparatus (both inner and outer sections) would be protected against cave-ins. Here we have a concession by the plaintiffs' expert that Everson does not operate on the principle of an inner and outer member; does not teach a machine that self-propels off the backfill in the trench and advances along the trench while at the same time affording full protection to men working within the machine, whether the telescoping sections are nested, or whether they are in their expanded position; and that for Everson to work there must be substantial side pressure, whereas side pressure is immaterial to the successful operation of the Torti device. It could not be disputed by the plaintiffs' own expert that Everson requires adjustment according to the width of the trench and he had to admit that it was sheer speculation to say that the bottom of the trench might provide enough friction to hold the machine, so that the inner section could be retracted. In Everson, the inner member or frame supports the outer channels, unlike the Torti invention wherein the outer shell supports the inner one. As to this, it must be understood that if in Everson the inner frame were supported by the outer members, the inner frame would move *rearwardly* when the cylinders expand, rather than remaining stationary and permitting the longitudinal channels to advance. I also find most significant that the intended operation of Everson is to advance longitudinal channels forwardly *one* at a time. Certainly this impairs its practical efficiency because as each channel moves ahead, it leaves a space, through which it would seem that the walls of the trench would be free to pass. It cannot be denied that the inner frame is a purely skeletal one which performs *no shoring function* and lastly, while it is true that Everson mentions using backfill to start the device in those cases where insufficient side pressure does not exist at the commencement of an operation, there is no suggestion in Everson of *continually* backfilling behind the apparatus as it moves along the trench. These were the differences argued to the patent examiner who must have concluded these were the distinguishing features of the claims of the Torti patent over the teachings of Everson. I quite agree, and therefore find that the Torti machine was not a mere combination of existing devices and is not to be

subjected to the "synergistic" test, reserved solely for combination patents.

### Novelty

The same reasons that support the finding that the Torti patent is not a combination demand a finding that the Torti patent possesses the requisite novelty under 35 U.S.C. § 102(b).

### Non-Obviousness

■ The Bazzell patent shows a trench tunnel device with overlapping wire-meshed covers reciting as a purpose the prevention of stone and lumps of earth from falling on the men inside. When considered with the prior art disclosures of the Everson patent, *supra,* plaintiffs contend that the Torti patent was an obvious development of the prior art.

The plaintiffs rest on 35 U.S.C. § 103, which provides as follows:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *"

An analysis of the meaning of § 103 is to be found in the Supreme Court decisions of Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) and United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L. Ed.2d 572 (1966). These cases establish that the Patent Act of 1952 "was not intended by Congress to change the general level of patentable invention" theretofore enunciated by the courts and that in the evaluation of obviousness, "the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; *and the level of ordinary skill in the pertinent art resolved.*

Against this background the obviousness or non obviousness of the subject matter is determined." (emphasis added) 383 U.S. at 17, 86 S.Ct. at 693.

Three controlling factors for evaluating obviousness are set forth: (1) the scope and content of the prior art; (2) the language of the claims to be compared with prior art; and (3) the evaluation of the claims in the light of the level of ordinary skill in the pertinent art.

Certainly in the trench shoring art the ambit of applicable art is limited and though the record presents no pertinent evidence targeted to the disciplines of persons involved, it is fair to assume the indicia is the background of Mr. Torti, that is, experience by reason of exposure rather than formalized education. What was accomplished by Torti was not a refined difference. In his field and setting it was an accomplishment of magnitude that should be so recognized.

■ The expert testimony presented, however, is insufficient to determine the issue of obviousness without looking to the "secondary factors" suggested in *John Deere* and in *Adams, supra.* Torti's invention enjoyed commercial success and acceptance by contractors in the trade and these are factors which though not telling in themselves must be considered. See Colourpicture Publishers, Inc. v. Mike Roberts Color Productions, Inc., 394 F.2d 431 (1st Cir.), cert. denied, 393 U.S. 848, 89 S.Ct. 134, 21 L. Ed.2d 118 (1968).

The evidence shows the number of machines built by the defendant and plaintiffs and their demand by contractors in trench digging, especially under difficult conditions. This is a significant factor, as stated in Oliver United Filters, Inc. v. Silver, 206 F.2d 658 (10th Cir. 1953). cert. denied, 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416 (1954), wherein the court wrote at 663–664:

"The courts may examine into the art to determine if the alleged discovery or invention has substantially ad-

vanced the art. If it has done so, there should be a liberal construction of the patent to secure to the inventor the reward which he deserves. This is especially true when the first time there has been commercial success of the invention. Commercial success in itself is not sufficient to sustain a patent but it is evidence of its validity and in doubtful cases may be the deciding factor."

It appears to me we have a slavish imitation of certain elements of the Torti invention by the plaintiffs. Such conscious copying is a recognizable feature that the invention is of patentable stature. Deliberate imitation is a real tribute to an invention.

The differences marking the distinction between the potential invention at issue and the older art are not trivial or obvious and the plaintiffs' machines accentuate this, for otherwise they would have had no incentive to copy. Rather they could have used the prior art or a variant of their own.

"The imitation of a thing patented by a defendant, who denies invention has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, and persuasive of what the rest of the world ought to think." Kurtz v. Belle Hat Lining Co., Inc., 280 F. 277, 281 (2nd Cir. 1922), as quoted in Shaw v. E. B. & A. C. Whiting Co., 417 F.2d 1097 (2d Cir. 1969).

The comparison of the Torti patent on the one hand with the Everson and Bazzell patents on the other is a classic example of *post hoc* speculation as to how bits and pieces of prior art might have been combined with knowledge after the event.

"It is usually, if not indeed always, easy to discover a genesis somewhere for any patentee's contribution. A thought expressed here, a hint appearing there and a suggestion made somewhere else can always be found, after the event, and assembled to support the contention that what the pat-

entee did was really nothing but what anyone else might do if so inclined. But if patents were to be held invalid on such reasoning few would survive. Even the greatest invention of all time, the wheel, had, we are told, its prior art of unnumbered savages slipping on round stones. How many slipped before some bruised genius among them literally fell upon the principle of the roller, and how many more years, or centuries, passed before some succeeding genius, building upon the prior art of rollers, thought of a fixed pivot and invented the wheel, can only be surmised." S.D. Warren Co. v. Nashua Gummed & Coated Paper Co., 205 F.2d 602, 605 (1st Cir. 1953).

As the Supreme Court stated in Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911):

"Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

In my opinion, and I so find, only a tortuous interpretation can conclude it was obvious that the overlapping covers of Bazzell could provide a top wall in the Everson patent. It cannot be debated that you simply don't have an inner wall for the inner chamber when there is independent movement of the top-most channel from that of the opposite side. I fail to see an obvious possibility of mounting the Bazzell covers on the Everson device and I, therefore, conclude

that the Bazzell patent fails to overcome the deficiencies of Everson.

As to the other prior art, it is hardly necessary to discuss it other than to say that if one with ordinary skill in the art was aware of all such prior art as relied on by the plaintiffs, it would not be obvious to him to modify Everson or any of the other patents whatsoever to arrive at the Torti invention.

·In the exercise of my fact finding prerogative, it is inescapable to me that the references to the prior art do not teach what is claimed and that the differentiation which the claims make over what is taught is not obvious and therefore I declare that the Torti patent is valid.

### Infringement

Initially it must be noted that I have previously entered an order, upon plaintiffs' motion in limine and upon memoranda submitted by both parties, in which I held that defendant has the burden of proof of infringement in this action.

The infringement controversy is confined to two areas of construction, namely, top walls on the inner and outer members of the defendant's device and the guide means between said sections. In the discussion of the plaintiffs' machine, the alleged top wall of the outer section is sometimes referred to by the generic colloquialism of "cat walk" while that of the inner section by the term "dog house." Simply speaking the plaintiffs contend that neither of these elements of the defendant's patent nor their equivalents exist on his machines so as to constitute patent infringement.

It is conceded by the defendant that if the top wall in his patent were eliminated, the resulting machine would be outside the scope of the patent and there would be no patentable invention.

It is well established law that it is fatal to a charge of infringement if the accused device omits a single element of a claim without inclusion of an equivalent.

It was held in Steigleder v. Eberhard Faber Pencil Co., 81 F.Supp. 143, 145 (D. Mass. 1948), aff'd, 176 F.2d 604, (1st Cir.), cert. denied, 338 U.S. 893, 70 S.Ct. 244, 94 L.Ed. 548 (1949):

"The question of whether or not there is infringement must be decided with reference to the claims of the patent which 'measure the invention' (Paper Bag Patent Case, [Continental Paper Bag Co. v. Eastern Paper Bag Co.], 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122), for it is in the claims that the inventor has set forth his own statement of what precisely his invention is. White v. Dunbar, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed. 303."

In Deller's Walker on Patents (2d Ed. 1965), § 246 at page 129, it is stated:

"The claims must be read in the light of the disclosure of the specification, not to restrict the invention to the precise structure disclosed, but to grasp the invention in order properly to measure the range of equivalents." Citing in footnote, Flowers v. Magor Car Corp., 65 F.2d 657 (3d Cir. 1933).

At page 131 we find:

"But a claim is not required to be limited to exact devices disclosed by the specification and drawings since the claims of the patent and not its specifications measure the invention." Citing in footnote, Oates v. Camp, 83 F. 2d 111 (4th Cir. 1936) and Flowers v. Austin-Western Co., 149 F.2d 955 (7th Cir. 1955).

The threshold question is whether file wrapper estoppel exists here, limiting the range of equivalents upon which the patentee would otherwise rely in an infringement suit. The substance of file wrapper estoppel is that where a patentee has narrowed his patent claim in response to a rejection of the Patent Office, in order to obtain issuance of a patent, he is estopped from resorting to equivalents with respect to those limitations which were so introduced. See, e. g., Bishman Mfg. Co. v. Stewart-Warner Corp., 380 F.2d 336 (7th Cir.), cert. denied, 389 U.S. 897, 88

S.Ct. 216, 19 L.Ed.2d 214 (1967). No such situation exists at bar, since those elements in the defendant's patent claims which plaintiffs allege are not present in their machines, namely, the top walls on the inner and outer sections and the guide means between the sections, were recited in the original claims filed by the defendant and were not added by amendment in order to obtain issuance of the patent. The plaintiffs conceded this through their own expert witness and there is no need to discuss it further.

## Guide Means

The first non-infringement contention made by the plaintiffs is that their machines do not have the same or equivalent cooperating guide means between the sections as called for by the Torti patent. As noted above, the four patent claims in question define the cooperating guide means on the inner and outer members and are sufficiently similar in scope so as to stand or fall together.

Claim 1 recites guide channels for the inner and outer members for guided movement and support of the inner member by the outer member. It is clear from the testimony of the defendant's witnesses (Johnson, DeChant and Cruit) that the plaintiffs' machines with which they were familiar and which they operated have rails extending forwardly from the rear inner section which pass through roller means carried by the inner surfaces of the side walls of the outer sections. The plaintiffs hardly dispute this but rather contend that these rails perform no guiding function but merely serve to reinforce the side walls of the center section against inward pressure from the side walls of the trench. This contention I reject being based on conclusory statements without supportive evidence. They also argue as a distinguishing feature the existence of some degree of clearance above and below the rails as they pass through the guide means in the center section in order to permit some minor degree of rotation between the rear and center sections in order to accommodate changes in grade and they argue that therefore there is an absence of guiding function. This is meritless and in this court's opinion flies in the face of the obvious and literal operation of the defendant's invention, and needs no foundation in sophisticated expertise. Each element of the defendant's guide rail means can be read so conclusively on the plaintiffs' machines that this court is justified in finding that if the guide rails in the plaintiffs' machines do not constitute an outright duplication, they amount to uncontestable equivalency. Mr. DeChant found the identical guide means with the slight variation of one roller instead of two. Simply speaking, in answer to a question embodying all of claim 1 as it pertains to the guide channels, he said he found the same structural relationship in his machine and this testimony remains uncontradicted and unimpeached. The same may be said as to Mr. Johnson who specifically identified the guide channels and affirmatively stated that the rear section is supported by the center section and so it was with Mr. Cruit as to his machine.

I find nothing worthy in the plaintiffs' position that the inner section is not supported by the outer section. The testimony of the witnesses above mentioned is clearly to the contrary. The plaintiffs' argument that when the inner shell is in its fully extended position, it engages the trench bottom and hence is being supported by the trench as well as by the outer section does not impress this court. Conceding it is possible to have such a situation, the plaintiffs overlook the obvious fact that the control of the hydraulic pistons can and does elevate the rearwardmost edge of the inner section above the trench floor. To say that at such point the sole support would not be coming from the outer section and the cylinders is too basic to warrant discussion. It simply cannot be disputed that plaintiffs' machines have fully equivalent guide means and as to this element of the claims, the plaintiffs'

machines infringe the defendant's patent.

### Top Wall

A discussion of this facet of the case requires a specific finding as to whether or not "top wall" means an entire cohesive covering. None of the plaintiffs' machines are so constructed, so if defendant's patent discloses complete top walls on each section, there could be no infringement here, except by application of the doctrine of equivalents.

While the claims themselves are not entirely clear on this point, it can hardly be denied that the drawings of the patent show a continuous top wall on each section of the machine. One need only look at figure 5 and when this is read together with the description in the specifications, it is inescapable that the patent sets forth solid top walls, allowing access to the interior of the machine only through trap doors provided for this purpose. I will not labor this point, for it appears to me the language of the specifications is clear and the defendant, for all practical purposes, concedes this by resting his position in the broad language of the claims which leave ambiguous the question of whether the top walls completely covered the area of the machine directly underneath. Thus the defendant must rely on the doctrine of equivalents for its proof of infringement.

The established standard of equivalents was set forth in Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950):

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

"But courts have also recognized that to permit imitation of a patented invention which *does not copy every literal detail* would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

"The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of Winans v. Denmead, 15 How. 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' [footnote omitted] *a patentee may invoke this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result'.*" [emphasis added] 339 U.S. at 607–608, 70 S.Ct. at 855, 856.

The trench shoring machine art is not a crowded one and this is a case uniquely suited for a liberal application of the doctrine of equivalents.

The evidence as to top walls and guide means related to certain specified ma-

chines manufactured by the plaintiffs but the evidence most favorable to the defendant is based upon two machines: one owned by the Vic Kirsch Construction Company of Hammond, Indiana, and one owned by the Greenfield Construction Company of South Carolina.

The defendant contends that plaintiffs' machines employed an approximately three-inch wide flange around the top edge of the machine and a three-foot wide "cat walk" across the outer section as well as a two-foot wide overhang above, the "dog house", which, taken together, are the equivalents of the "top walls" in the defendant's invention. It must be noted in this regard that defendant used the following language of limitation in his claims:

> "A trench shoring machine * * * having * * * top walls, said walls being rigid plates for engagement with earth forming a trench and *protecting the same from cave-ins and the like* * * *" [emphasis added]

Essentially the same functional language was set forth in the Torti patent specifications.

The evidence introduced can be found to establish that when plaintiffs' machines were in operation, the workers inside the machines sought the shelter provided by the flange above the "dog house", since the space between the flange and the top of the pipe being laid was from 4 inches to 2½ feet, and thus the workers were protected from the possibility of backfill falling in upon them. The evidence also demonstrates that the workers often stood under the "cat walk" for protection from pipe being lowered into the machines.

■ Based upon this evidence defendant contends that the "cat walk" and the "dog house" in plaintiffs' machines each peformed a "protective function" with respect to the workers inside the machines, and therefore they were equivalent to the "top walls" claimed in the defendant's patent. This court agrees that both elements of the plaintiffs' machines offered some protection, but "protective function" is not the proper test of the alleged equivalents to the "top walls." Defendant specifically claimed that his invention protected against "cave-ins and the like" and therefore the proper inquiry is whether the "dog house" and the "cat walk" on plaintiffs' machines performed substantially that same function in substantially the same manner to obtain substantially the same result. While the "dog house" protected against an avalanche of backfill and while the "cat walk" protected against falling pipe and perhaps against falling rocks and dirt across its three-foot width, the plaintiffs' machines offered absolutely no protection against cave-ins from the sides of the machines, because the top of both the inner and outer sections of those machines were completely open, except for the narrow "cat walk" and "dog house." Thus I find that, with a liberal interpretation of the defendant's claims, there is enough evidence in the record to establish that the "dog house" protected against "cave-ins and the like" (though admittedly only against cave-ins of backfill), but there is absolutely no evidence (nor does it seem that there realistically could be convincing evidence) that the "cat walk" was able to perform substantially the same function as the patented invention of protecting against "cave-ins and the like." Thus there is no equivalent in the plaintiffs' machines to the top wall of the outer section, as set forth in each of the claims in the defendant's patent, and therefore this court finds no infringement.

■ Though not argued to the court, I am well aware of the possible contention that since the evidence tended to show that most, if not all, of the work *actually done* by plaintiffs' machines was done *above* ground, this court's opinion ought to be limited to those facts. If the court were to accept that limitation, it may be that I could find infringement here, since the side walls of the plaintiffs' machines would be protecting workers from cave-ins and the top walls would be immaterial. That argument would have to be rejected, however, because (even aside from the issue

of prior art disclosures upon such use) surely the proper inquiry is into the claims drawn upon the machine itself, not into the uses to which the machine is actually put. Certainly a patent claim on a laser beam would not be infringed by someone who used a pair of scissors in cutting paper (even assuming, *arguendo,* that they were equivalents) merely because the laser beam could also possibly be used for cutting paper.

### Patent Misuse

Though this court's opinion as to infringement is dispositive of the issue of patent misuse I will, nevertheless, consider same for the purposes of appellate review.

The defendant entered into certain agreements relating to the patent with four contractors, namely Campanella & Cardi Construction Company, PT & L Construction Co., Inc., W. C. Sykes Co., Inc., and Gordy Construction Company. These contracts embodied obligations upon the licensee to make royalty payments for 99 years and restrictions upon the resale and disposition of the patented machines that had been transferred to the licensees and over which the defendant had parted with both title and dominion.

Excepting the Campanella & Cardi agreement, the defendant does not dispute that their restrictive provisions calling for payments of royalty for a period beyond the life of the patent are per se patent misuse, and this court so finds. Brulotte et al. v. Thys Company, 379 U.S. 29, 85 S.Ct. 176, 13 L.Ed.2d 99. I rule, therefore, that the patentee may not enforce his patent for the duration of the misuse which the record shows is from the earliest date of the three illegal agreements, namely March 12, 1968 to the date of February 11, 1970, when they were purged by amendments. Hensley Equipment Co., Inc. v. Esco Corp., 5 Cir., 383 F.2d 252, and The Peelers Company v. Wendt et al., D.C., 260 F. Supp. 193.

The Campanella & Cardi agreement containing no restriction beyond the life

of the patent is perfectly legal. It granted a license to make one of the defendant's machines and to use it within a prescribed geographical area. Brownell v. Ketcham Wire & Mfg. Co., 9 Cir., 211 F.2d 121.

### PLAINTIFFS HAD CONSTRUCTIVE NOTICE OF DEFENDANT'S PATENT

35 U.S.C. § 287 reads as follows:

"§ *287. Limitation on damages; marking and notice*

Patentees, and persons making or selling any patented article for or under them, may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this cannot be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."

In the present case, the evidence is clear that as soon as defendant received his patent, he marked those patented machines of his that were then in existence with the patent number, and that he has continued to mark all subsequent machines with his patent number. Counsel for the plaintiffs, during his cross examination of Mr. Torti, apparently attempted to prove that the notice was not sufficiently prominent and that it was applied to the inside wall of the machine rather than the outside thereof; but, as defendant Torti pointed out, the constant contact between the outside surface of the walls of his machine and the sides of the trench would quickly have worn away any notice applied

thereto, and hence it makes a great deal more sense to apply the notice to the inner surface of the walls, as he did.

 The record is clear that Mr. Torti discharged his obligation pursuant to § 287 of the Code and had the court found infringement, would have been entitled to an accounting for all infringements of his patent from the date of issue thereof, excepting the period between March 12, 1968 and February 11, 1970.

 Therefore it is concluded as a matter of law that:

A. The Torti Patent in suit No. 3,089,310 has been the sole property of the defendant at all times since its issuance and claims 1, 2, 3 and 4 are good and valid in law.

B. File wrapper estoppel has not been established and is inapplicable here.

C. The plaintiffs have not infringed the claims of the Torti Patent in suit for the reason that none of the plaintiffs' machines has the element of a top wall on its outer telescoping member, nor any equivalent thereto.

D. The award of costs to the plaintiffs will be considered by this court as a separate issue to be decided on briefs and arguments.

For these reasons this court finds the Torti Patent valid but not infringed.